1
2
3
4
5
6
7
8        UNITED STATES DISTRICT COURT
9        SOUTHERN DISTRICT OF CALIFORNIA
10

11  CEDRIC RODGERS,                          Case No.:  21cv1534-GPC-NLS
12                              Plaintiff,   **REPORT AND RECOMMENDATION**
13  v.                                       **FOR ORDER GRANTING IN PART**
                                             **AND DENYING IN PART**
14  KILOLO KIJAKAZI, Acting                  **PLAINTIFF'S MOTION FOR**
    Commissioner of Social Security,         **SUMMARY JUDGMENT**
15
16                              Defendant.   **[ECF No. 11]**
17

18          Plaintiff Cedric Rodgers ("Plaintiff") brings this action under the Social Security

19  Act, 42 U.S.C. § 405(g), and seeks judicial review of a final decision by the

20  Commissioner of Social Security ("Commissioner") denying his application for social

21  security disability benefits under Title II of the Social Security Act.  Plaintiff filed a

22  motion for summary judgment, Defendant filed an Opposition, and Plaintiff filed a

23  Reply.  ECF Nos. 11, 12, and 14.  This case was referred for a report and

24  recommendation on Plaintiff's motion for summary judgment.  ECF No. 6; *see* 28 U.S.C.

25  § 636(b)(1)(B).  After considering the papers submitted, the administrative record, and

26  the applicable law, the Court **RECOMMENDS** that Plaintiff's motion for summary

27  judgment be **GRANTED IN PART** and **DENIED IN PART**.

28          //

## I.     BACKGROUND

### A.     Procedural History

Plaintiff filed a Title II application for Social Security Disability Insurance and Title XVI application for supplemental security income on November 15, 2016. Administrative Record ("AR") 259-269.  He alleged an inability to work since June 1, 2012.  *Id*.

The Commissioner initially denied Plaintiff's claim on February 27, 2017, and on reconsideration on May 31, 2017.  AR 159-162, 164-168.  On June 21, 2017, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 3, 2018.  AR 35-53.  Plaintiff testified at the hearing where he was not represented by counsel.  *Id*.  An impartial vocational expert also testified at the hearing. *Id*.  On February 14, 2019, the ALJ issued a decision denying Plaintiff's request for benefits, finding that Plaintiff was not disabled under the Social Security Act.  AR 138-151.  On appeal, on April 20, 2020, the Appeals Council vacated the ALJ's decision and remanded the case back to the ALJ.  AR 156-158.

The ALJ held a second hearing on November 9, 2020, where Plaintiff was represented by counsel.  AR 54-73.  On March 25, 2021, the ALJ issued another decision denying Plaintiff's request for benefits, finding that Plaintiff was not disabled under the Social Security Act.  AR 12-34.  On June 26, 2021, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security for judicial review purposes.  AR 1-6.  Plaintiff timely commenced this action in federal court.

### B.     Personal History and Medical Treatment

Plaintiff was born on July 9, 1986.  AR 40.  He went to college and has an Associates Degree.  AR 40, 59.  He also went to high school at Casa by the Sea.  AR 59. He testified that he had to drop out after he had a seizure.  AR 40.  His previous employment included working as a sign holder for a restaurant/store, where he would work for a couple of hours a day for about 4-5 months.  AR 41-42.  He stated that he left

that job because business was slow and they did not need him anymore.  AR 671.  Prior to that job, he also worked as a cashier for CVS, where he was working about 30 hours a week.  AR 42.  He worked at CVS for about 4 years but had to leave due to a conflict with the manager.  AR 42, 671.

Plaintiff testified that he suffered from seizures, primarily minor ones with twitching.  AR 43, 60.  At the time of his first hearing, he testified that he last experienced one a couple of months prior to the hearing, and at the time of his second hearing, he testified that it had been a couple of years since he had had one.  AR 43, 60-61.  He was taking medication for the seizures and reported only a side effect of feeling hungry.  AR 43, 61.  As for other issues, he testified that he had trouble focusing and feeling "like there's a pulsing in my head," vertigo, and anxiety.  AR 43-44.  He also testified that he has pain in his shoulders due to a hyperextension and would need surgery to get it fixed.  AR 44.  This pain limited his ability to lift his arms above the shoulder level.  AR 44, 60.  He testified at the first hearing that he could carry 20 pounds.  AR 44.  At the second hearing, he testified that he could carry a grocery bag, with a gallon of milk or water, in his left hand but not with his right hand.  AR 64.  At the first hearing, he testified that he could sit for a couple of hours at a time, walk for two hours at a time, and did not have any issues bending down and getting back up.  AR 45.  At the second hearing, this was reduced to an hour.  AR 65.  He testified that he suffered from Obsessive Compulsive Disorder and this manifests in him having to plan when he leaves the house.  AR 47-48.  He also testified that he suffered from depression and PTSD.  AR 61-62.  His PTSD issue is related to his high school experience at Casa by the Sea.  AR 66.  He does not take any medication for these issues.  AR 62.  He testified that he also experiences anger and frustration with persons that prevents him from having a job.  AR 62-63.

He was living alone at the time of the hearings.  AR 46, 63.  He receives CalFresh aid, Medi-Cal, and financial help from his mother.  AR 63.  He testified that he spends his days  relaxing, watching TV, listening to music, reading, or talking to people.  AR 46,

65.  He does cook but only using the microwave.  AR 65-66.  He does not have a driver's license and walked to the hearing.  AR 40.  Plaintiff is left-handed.  AR 49.

### C.   Medical Record

#### 1.   History of Seizures

Plaintiff reported experiencing seizures since he was 18 years old.  AR 289.  He reports losing consciousness, having convulsions, but not biting his tongue or losing bladder control.  AR 289.  He reports being able to resume normal activities on average 1-2 days after the seizure.  AR 289.  His medical record contains hospital admissions following seizures, visits for medication, and regular visits with his neurologist.

##### A.   Hospital Visits

On March 18, 2008, Plaintiff was first admitted to the hospital for a Grand Mal seizure.  AR 939-83.  He experienced a 3-minute episode of body stiffening, poor responsiveness, and upper extremity shaking.  AR 939.  The doctor noted that he had previously experience a similar episode in November 2007.  AR 939.  He was not prescribed or taking any seizure medication at this time.  AR 939.  Tests done at the hospital indicated that he had a history of chest pain, but his heart, lungs, and mediastinum all appeared normal, and his EKG was normal.  AR 941, 968, 970.  He was sent home the same day.  AR 964.  He was given Dilantin in the hospital and given a prescription, along with a referral to a neurologist.  AR 941.

On September 15, 2011, Plaintiff presented with a seizure when he was walking to work, causing him to sustain a fall to his face.  AR 492.

On October 6, 2011, Plaintiff presented with a 1-2 minute long seizure he experienced while at work.  AR 483.  He stated that he had no insurance and could not afford his medication.  AR 483, 485.

On November 13, 2011, Plaintiff presented with a seizure while he was at work at CVS.  AR 477.  He stated that he did not take medication that day.  AR 477.

On February 25, 2012, Plaintiff had a seizure at work.  AR 471.  He presented with no trauma, but was positive for aura of dizziness prior to the seizure.  AR 472.  He was

noted to be noncompliant with seizure medication, and that his last seizure was a month ago.  AR 471.  He also stated that he was not able to get medications due to lack of insurance.  AR 472.  He was prescribed with an inexpensive alternative to Keppra.  AR 475.

On July 16, 2012, Plaintiff presented with a minute long, full body seizure while crossing the street, falling and hitting his head.  AR 457.  Notes state that Plaintiff should be on seizure meds, but he was not sure of the name and they had not been taken for 2-3 weeks.  AR 450-60.  Plaintiff stated that he has the medications at home, but "does not like taking them because he feels he doesn't need them."  AR 460.  The notes further state that it seems the medication is not ineffective, but the issue was non-compliance.  AR 461-62.  He also received a neurology consult.  AR 465.  He was reported as being alert and attentive, but "very mentally slow" and "simplistic in answers and content."  AR 466.  His CT head scan and labs were largely negative.  AR 466.  He was prescribed an increased dose of Keppra.  AR 466.

On September 8, 2012, Plaintiff presented with another seizure after being found by neighbors in his apartment complex.  AR 454.  He claimed that he woke up late that day and did not take his Keppra.  AR 455.  Further, he stated that he was taking it only once a day rather than the twice a day prescribed.  AR 455.  The physician gave him a refill prescription and told him to take it twice a day.  AR 455.  A few days later, on September 19, 2012, Plaintiff had another seizure, lasting one minute.  AR 452  He claimed he was taking his Keppra medication at that time, but was not sure if he may have missed a dose.  AR 452.

On October 10, 2012, Plaintiff presented with another seizure in his room, where he seized for one minute and fell, causing a nasal bone fracture.  AR 439, 443.  He states that he ran out of Keppra medication at that time, and that he did not have a regular doctor to write prescriptions because he was not insured.  AR 440.  He stated that he last had a seizure a few months prior and 4-5 episodes within the last year.  AR 440-41.  He had a head CT at this appointment, and the results were normal.  AR 446.

On May 12, 2013, Plaintiff was brought in for a seizure he experienced while playing video games with a friend.  AR 435.  He claims to not remember the seizure, nor could he remember the last time he had a seizure.  AR 434.  At this time, he claimed that he had been non-compliant with medication for 9 months.  AR 434.

On March 7, 2014, Plaintiff again presented with a seizure that lasted 2 minutes, where he fell forward on the curb and sustained trauma to his nose.  AR 428.  He stated that he was compliant with medication.  AR 428.  At this visit, he claimed he last experienced a seizure on February 28, 2014, but there is no information regarding this episode in his medical history.  AR 430.

On December 28, 2014, Plaintiff again was taken to the hospital for a 1.5 minute long seizure.  AR 423.  This seizure occurred at his home, and caused him to fall forward, sustaining carpet burns, a tongue bite, and dried blood on his lips.  AR 425.  At the time of this seizure, he stated that he was taking Lamictal and had taken a dose that morning. AR 423.  He was given a dose of Ativan before being discharged.  AR 426.

On October 27, 2016, Plaintiff was taken to the hospital for a seizure he had while at school.  AR 822.  He stated that he felt an aura, felt his whole-body twitch, and bit his tongue.  AR 822.  He stated that he had been in compliance with his Depakote.  AR 822. He was given a further dose of Depakote and discharged home.  AR 824.

On Plaintiff's seizure questionnaire, he also reported two other seizures on April 20, 2017 and March 20, 2017.  AR 289.

B.   Medications

Plaintiff was seen at Family Health Centers of San Diego regularly from 2012 to 2016 to help manage his seizures.  He had a visit on March 30, 2012, where it was noted that he had been prescribed Carbamazepine after an ER visit.  AR 596.  The notes indicated that he declined medications, noting "I gave up."  AR 597.  He had a visit on April 19, 2012, where he was noted to take Carbamazepine twice daily, but he was taking it once since the second dose made him sleepy.  AR 594.  He had a visit on January 16, 2013, to refill his Keppra medication.  AR 592.  It was noted that he started this

medication two month ago, to be taken twice a day, but he was only taking it once a day and sometimes not at all.  AR 592.  He was noted to be "very argumentative" with his mother about taking his medications as prescribed.  AR 592.  He did not have insurance at that time (under LIHP – California's Low Income Health Plan), but was in the process of reapplying.  AR 592.  He had a visit on March 18, 2013, to refill his Depakote medication.  AR 591.  He had a visit on July 10, 2013, to refill his Dilantin medication.  AR 587.  He had a visit on July 12, 2013, to discuss medications.  At this appointment, he said that his prior medication of Keppra made him sleepy, but Dilantin seemed to be working pretty well, with only small breakthrough seizures, no grand mal.  AR 585.  His Dilantin was increased at this visit.  AR 586.  On a March 10, 2014 visit to refill his Dilantin medication, it was noted that he recently experienced two seizures and there was a miscommunication regarding how many times a day he was to take Dilantin.  AR 619. At a July 23, 2014 follow-up neurologist visit, he was noted to have uncertain compliance with his Dilantin medication and experiencing occasional seizures.  AR 616.  At a visit on July 1, 2015, he was noted to be compliant with his meds and experienced no recent seizures since starting Divalproex.  AR 609.  On a November 9, 2016 visit, it was noted that Plaintiff had no seizures since Depakote dose was adjusted.  AR 599.  He had a visit on November 14, 2016, where his medication of Depakote was decreased.  AR 584.  On an April 24, 2017 visit, Plaintiff presented with no complaints other than occasional seizures.  AR 744.  On a June 21, 2017 visit, Plaintiff was found to have elevated dose of Depakote and his medication was decreased.  After decreasing the dose, Plaintiff did not have seizures.  AR 741.  On April 24, 2018, Plaintiff's levels were too low so he was asked to increase his medication dosage.  AR 787.  On a visit on May 15, 2018, notes indicated the Plaintiff had been asked to increase his medication level but he did not do it, so he came in to get his levels checked.  AR 785.  On a December 17, 2018 visit, it was noted that he was on Depakote and experienced no recent seizures.  AR 730.

//

//

### C.    Neurologist Dr. Boris Khamishon

From July 2014 to May 2018, Plaintiff was treated by neurologist Dr. Boris Khamishon for his seizures.  AR 695.  On his first visit on July 2, 2014, Dr. Khamishon noted his history of seizure episodes and medications.  AR 695-97.  He saw Dr. Khamishon again on August 28, 2014, where it was noted that he had another seizure on August 14.  AR 698.  It was noted that he is on Dilantin but keeps forgetting to take it.  AR 698.  His medication was changed to Lamictal.  AR 698.  In his next visit on October 20, 2014, Dr. Khamishon noted that Plaintiff had several grand mal seizures as he was switching his medication to Lamictal from Dilantin.  AR 701.  His dosage was upped at this appointment.  AR 701.  At his next January 20, 2015 visit, Dr. Khamishon noted that Plaintiff had several seizures around that time and changed his medication to Depakote.  AR 704.  At his next appointment on May 21, 2015, Dr. Khamishon noted that Plaintiff did not report any seizures and that increasing his Depakote levels seemed to work well.  AR 707.  Next, on October 28, 2015, Dr. Khamishon again noted no seizures on Depakote and the only side effect was occasional drowsiness.  AR 709.  At a check-up on April 28, 2016, Dr. Khamishon noted that Plaintiff continued to have no seizures.  AR 712.  Plaintiff was off Depakote for a while on his own and doing well, but was back on it.  AR 712.  On November 2, 2016, Dr. Khamishon noted that Plaintiff had a seizure two weeks prior .  AR 715.  He noted that dehydration may have been a factor, and increased Plaintiff's Depakote level.  AR 715.  On May 11, 2017, Dr. Khamishon noted that Plaintiff had another seizure episode in April 2017.  AR 718.  His Depakote level had been decreased since his last visit, but Dr. Khamishon increased it back up.  AR 718.  On November 9, 2017, Dr. Khamishon noted that Plaintiff had no seizures, but was experiencing some auras and transient sensations of dizziness.  AR 721.  On May 17, 2018, Dr. Khamishon noted that Plaintiff had no seizures recently and took a trip to Japan with no incidents.  AR 724.  Dr. Khamishon also ordered an EEG for Plaintiff on November 2, 2016 and November 9, 2017, the results of which were both normal.  AR 727-28.

### 2. Right Should Injury

Plaintiff also suffered a right shoulder dislocation that causes him frequent pain. He was seen at Family Health Centers of San Diego related to this issue.  On June 21, 2016, he presented with shoulder pain.  AR 603.  It was noted that his right shoulder had severely restricted range of movement, and TTP[1] in the right shoulder was significant. AR 603.  He was referred to orthopedics, and given Motrin and told to ice the area.  AR 604.  His medical records do not contain other entries related to this injury.

### 3. Mental Health Issues

Plaintiff was noted at a visit on April 27, 2016, to get a bus pass to have mild mental retardation (IQ 50-70) and moderate depression.  AR 606.

Plaintiff's therapy notes from a July 17, 2015 intake session at Family Health Centers of San Diego state that he has a history of depression in middle school through high school, which was treated with medication and therapy.  AR 629.  He describes feeling "blah," and not caring about things, social isolation, and no motivation.  AR 629. He described getting nervous around people and crowds.  AR 629.  He denied any suicidal or homicidal ideations or psychosis.  AR 629.  His mental exam at the visit showed that he was alert, oriented to person/place/time, with appropriate dress but poor hygiene, slow and monotone speech, tangential and circumstantial thought process, blunted affect, below average intellect, depressed mood, poor memory, slowed motor, poor judgment and insight, with a GAF score of 62.  AR 632.

After this intake, in a treatment plan dated July 31, 2015, he started individual therapy twice a month.  AR 628.  In a treatment plan dated January 15, 2016, he was noted to have a history of depression and anxiety, and treatment plan stated that he would continue his individual therapy but only once a month.  AR 627.  He terminated his therapy sessions on July 22, 2016.  AR 806.

---

[1] TTP refers to trigger points that are raised spots in a band of muscle that can cause pain.  *See* https://www.healthline.com/health/trapezius-trigger-points#about.

On February 3, 2017, Dr. Kathy Vanderburgh conducted a consultative evaluation of Plaintiff.  AR 668.  She stated that he suffered from a history of depression and anxiety, and has memory impairment where he has to write all information down.  AR 671.  At the time of this evaluation, he was no longer under any mental health treatment.  AR 671.  He was noted to be able to bathe and dress independently, but was strongly malodorous.  AR 672.  He stated that his mother does his laundry, but he is capable of washing dishes, vacuuming, sweeping the floor, using a microwave, shopping independently for food and personal items, and managing money.  AR 672.  He spends time watching TV, listening to the radio, reading, using a computer, spending time with his friends, and going on walks.  AR 672.  He does not drive, but can take the bus independently.  AR 672.

Dr. Vanderburgh found Plaintiff appropriately dressed, with normal posture and gate, but poor hygiene.  AR 672.  He conversed in a pleasant and cooperative manner.  AR 672.  He was alert and could understand simple questions.  AR 672.  His thought process was organized, with no hallucinations or psychotic behavior.  AR 672.  His speech was normal, and his mood and affect were normal.  AR 672-73.  His memory was intact and he could recall adequate details of his personal history.  AR 673.  He was able to focus during the exam, including recalling six digits forwards and four digits backwards and spelling the word "world" forwards and backwards.  AR 673.  He had an average fund of knowledge and insight/judgment.  AR 673.

Dr. Vanderburgh administered some tests, and overall, found that Plaintiff was upper low average to average in intellectual function, low average range for memory for new information, and completed tasks at an appropriate pace.  AR 674.  She diagnosed him with anxiety disorder, depressive disorder, and rule-out pervasive developmental disorder.  AR 674.  She found him to have no limitations as to ability to socially interact with others, understand instructions, sustain an ordinary routine, complete simple or detailed tasks, concentrate for at least 2-hour increments, avoid normal hazards, or handle funds.  AR 675.  She found moderate limitation only in his ability to complete complex

tasks.  AR 675.  She also noted that his hygiene issue was severe, and he may have significant issues finding employment if this was not addressed.  AR 675.

Plaintiff began therapy again in 2018.  On a visit on April 18, 2018, Plaintiff came in to restart therapy.  AR 801.  He indicated that he had a history of depression and anxiety.  AR 801.  He discussed how his father committed suicide when he was young, he is close to his mother, he had behavior issues as a child, and lived in a residential treatment facility in Mexico for 2 years to correct his behavior.  AR 801.  On a visit on September 25, 2018, Plaintiff came in for a psychiatric evaluation for depression and anxiety.  AR 797.  Plaintiff stated that he was depressed and anxious about an upcoming court date related to the disability claim.  AR 797.  He claimed to experience "out of body experiences," disorientation, and vertigo.  AR 797.  He denied feeling hopelessness, hallucinations, or any suicidal/homicidal ideations.  AR 797.  During his mental health exam, he was cooperative, with normal speech, articulate language, linear thought process, appropriate associations, and normal thought content, appropriate judgment/insight, oriented, appropriate fund of knowledge, appropriate attention span/concentration, fair memory, and anxious mood/affect.  AR 798.  He declined antidepressants, and wanted to continue psychotherapy.  AR 798.  In a treatment plan dated October 1, 2018, Plaintiff indicated that he wanted to work on increasing social interactions and decrease isolation through client-based therapy.  AR 795.  On March 4, 2019, Plaintiff had a therapy session.  AR 914.  On April 3, 2019, Plaintiff went to a therapy session, reporting no changes in his symptoms.  AR 903.  Plaintiff presented as alert, oriented to person/place/time, moderate hygiene, appropriate dress, slow speech, coherent thought process, cooperative, normal affect, average intelligence, anxious mood, normal memory, age-appropriate motor skills, fair judgment, and fair insight.  AR 905.  A similar treatment plan was made on September 12, 2019.  AR 893.  Plaintiff stopped this round of therapy on October 12, 2020.  AR 864.

//

//

#### 4.   Obesity

Plaintiff also had several appointments to address his obesity.  These visits occurred from July 16, 2015 to August 13, 2020.  AR 733-794, 865-919, 933-35.  During these visits, his weigh ranged from 188 to 247, with a BMI of 27-35.2.  These visits primarily targeted educating Plaintiff on nutrition and exercise.

#### 5.   State Agency Consultants (T. Do, V. Michelotti, M.D.)

The state agency physical consultants opined that Plaintiff can lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for 6 hours of an 8-hour work day; sit for 6 hours of an 8-hour work day; no limitation on pushing or pulling; occasionally climb ramps and stairs; never climb ladders, scaffolds or ropes; frequently balance, stoop, kneel, crouch; occasionally crawl; limited reaching to right overhead; unlimited gross manipulation handling, fine manipulation fingering, and feeling; no visual, communicative, or environmental limitations; no limitations to extreme cold, extreme heat, wetness, humidity, noise, or fumes/odors/dusts/gases/poor ventilation; avoid concentrated exposure to vibration; and avoid even moderate exposure to hazards. AR 83-85; 114-16.

#### 6.   State Agency Consultants (A. Franco, H. Abrahimi, PsyD)

The state agency mental consultants opined that Plaintiff had severe depression and non-severe anxiety and obsessive-compulsive disorders.  AR 80-81, 112.  They found that Plaintiff had mild limitations in ability to understand, remember or apply information, to interact with others, and to adapt or manage oneself.  AR 81, 112.  They found that Plaintiff had a moderate limitation in his ability to concentrate, persist, and maintain pace.  AR 81, 112.  The notes further stated that Plaintiff has overall average to low cognitive and mental functioning, and had an issue with poor hygiene.  AR 81, 112. Plaintiff could do simple 1-2 tasks and semi-skilled work with limited public contact, and can otherwise interact/adapt and sustain for the usual day/week with the customary breaks.  AR 81, 112.

They opined that Plaintiff did not have issues understanding or with memory, but

Plaintiff was moderately limited in his ability to carry out detailed instructions and to maintain attention and concentration for extended periods.  AR 85, 117.  Plaintiff was not significantly limited in his ability to carry out short and simple instructions, to perform activities within a schedule, maintain regular attendance, or be punctual within customary tolerances, to maintain ordinary routine, to work in coordination with or in proximity to others, to make simple work-related decisions, and to complete a normal workday or workweek without interruptions.  AR 85-86, 117.  In addition, they opined that Plaintiff was moderately limited in his ability to interact with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness, but was not significantly limited in his ability to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, or to get along with coworkers or peers.  AR 86, 117-18.

### D.    Vocational Expert's Testimony

At the first hearing, vocational expert ("VE") Mary Jesko testified.  Ms. Jesko identified Plaintiff's prior work as Retail Cashier, performed at a light level, and Fast-Food Worker, also performed at a light level.  AR 48.  The ALJ asked the vocational expert to assume a person with the same age, education, and work experience as the Plaintiff, with the residual functional capacity lift and/or carry 50 pounds occasionally and 25 pounds frequently, sit, stand and/or walk for 6 hours of an 8-hour work day, frequent postural capability but limitation for occasional stairs, no ladders/ramps/scaffolds, no unprotected heights, no dangerous moving machinery, right overhead extremity (non-dominant) limited to occasional reaching, unskilled, and limited public contact.  AR 48-49.  The VE testified that past work could not be performed, but other work could be performed, for example, as a lacer, bench assembler, and lens inserter.  AR 49.  The ALJ then changed the hypothetical to limiting not being able to do any bilateral over shoulder reaching, lifting and/or carrying 20 pounds occasionally and 10 pounds frequently, sitting for two hours total, standing/walking for two hours at a time total, no unprotected heights, no dangerous moving machinery, no driving, unable to

understand, remember, or carry out simple tasks, not being able to do a 40-hour work week on a regular basis, and not being able to adequately handle work routines, changes, or stressors.  AR 50.  The VE testified that, under these restrictions, Plaintiff would not be able to work.  AR 50.

At the second hearing, VE Nelly Katsell testified.  Ms. Katsell identified the same prior work.  The ALJ asked the vocational expert to assume a person with the same age, education, and work experience as the Plaintiff, with the residual functional capacity lift and/or carry 50 pounds occasionally and 25 pounds frequently, sit, stand and/or walk for 6 hours of an 8-hour work day, frequent postural capability but limitation for occasional stairs, no ladders/ramps/scaffolds, no unprotected heights, no dangerous moving machinery, and right overhead extremity (non-dominant) limited to occasional reaching.  AR 68-69.  The VE testified that he could go back to his past work.  AR 69.  The ALJ then added the limitations that he could understand, remember and carry out unskilled job instructions and simple tasks, can use judgment and ask questions, can respond to supervision, coworkers, and usual work situations, can deal with changes in a routine work setting, but can only have occasional or limited public interactions.  AR 69-70.  The VE testified that such a person could no longer perform Plaintiff's past work, but could perform other light work at the SVP-2 level, such as garment folder, garment bagger, conveyor bakery worker, and medium work at the SVP-2 level, such as garment maker, laundry worker, or package handler.  AR 70.  Finally, the ALJ changed the hypothetical to lifting/carrying 8 pounds with left dominant hand and 7 pounds with right non-dominant hand, no lifting/reaching above the shoulder level, sit/stand/walk for one hour at a time, alternating positions, bending and posturing capabilities rare, unable to understand, remember and carry out simple job instructions, unable to interact with others, unable to respond to work routines or changes in a work setting, cannot work around unprotected heights or dangerous moving machinery, and unable to do a 40-hour work week or 8 hour work day.  AR 71.  The VE testified that no jobs could be performed with these limitations.  AR 71.  The ALJ also asked if the previously identified

jobs could be performed with no reaching bilaterally above the shoulder level, and the VE testified that no jobs could be performed with that limitation.  AR 71-72.

## II.      THE ADMINISTRATIVE DECISIONS

### A.      The Sequential Process

To qualify for disability benefits under the Social Security Act, an applicant must show that he or she cannot engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least twelve months.  42 U.S.C. §§ 423(d), 1382(c)(a)(3).  The Social Security regulations establish a five-step sequential evaluation to determine whether an applicant is disabled under this standard.  20 C.F.R. §§ 404.1520(a), 416.920(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).

At step one, the ALJ determines whether the applicant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(b).  If not, then at step two the ALJ must determine whether the applicant suffers from a severe impairment or a combination of impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(c).  If the impairment is severe, at step three the ALJ must determine whether the applicant's impairment or combination of impairments meets or equals an impairment contained under 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* §§ 404.1520(a)(4)(iii), 416.920(d).  If the applicant's impairment meets or equals a listing, he or she must be found disabled.  *Id.*

If the impairment does not meet or equal a listing, the ALJ must determine the applicant's residual functional capacity ("RFC"). [2]   20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(e). Then, the ALJ must determine at step four whether the applicant retains the residual functional capacity to perform past relevant work.  *Id.* §§ 404.1520(a)(4)(iv), 416.920(f).  If the applicant cannot perform past relevant work, at step five the ALJ must consider whether the applicant can perform any other work that exists in the national economy.  *Id.* §§ 404.1520(a)(4)(v), 416.920(g).

---

[2] A claimant's residual functional capacity ("RFC") is the most he can still do in a work setting despite impairments. See, 20 C.F.R. § 404.1545(a).

The applicant carries the burden to prove eligibility from steps one through four but the burden at step five is on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003). Applicants not disqualified at step five are eligible for disability benefits. *Id.*

### B. The ALJ's February 14, 2019 Decision

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from his alleged disability onset date of June 1, 2012, through his date last insured of September 30, 2017. AR 144.

At step two, the ALJ determined Plaintiff had the following severe impairments: epilepsy, hyperextension of the shoulders, developmental disorder, and obesity. AR 144. The ALJ found that the claimant's other impairments of obsessive-compulsive disorder and anxiety were not severe and do not cause more than minimal limitation in his ability to perform basic work activities. AR 144.

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. AR 144-145. As to Plaintiff's obesity, the ALJ specified that limitations caused by obesity impairments would be considered in determining Plaintiff's RFC. AR 145. As to Plaintiff's mental impairment, the ALJ found that did meet the Paragraph B criteria. AR 145.

Next, the ALJ determined that Plaintiff retained the RFC to perform work as follows:

> [t]he claimant [can] lift and carry 50 pounds occasionally and 25 pounds frequently. He can stand and/or walk for 6 hours and sit for 6 hours in an 8-hour workday. He can occasionally climb stairs, but not ladders, ramps or scaffolds. He otherwise has frequent posturing capabilities. He cannot work around unprotected heights or dangerous moving machines. He can occasionally reach overhead with the right upper extremity (non-dominant). He is limited to unskilled, 1-2 step tasks. He is able to engage in limited public contact.

AR 146. In making his RFC assessment, the ALJ noted he had considered all of Plaintiff's symptoms along with the objective medical evidence and other evidence in the

record.  AR 147-149.

At step four, the ALJ determined that Plaintiff could not perform his past relevant work as a retail cashier or fast-food worker.  AR 149.  However, the ALJ found that with his age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform.  AR 150-151.  As such, the ALJ concluded Plaintiff is not disabled as defined in the Social Security Act.  AR 151.

### C.   Order to Appeals Council

Plaintiff requested that the Appeals Council review the ALJ's first decision, and the Council granted the request for review, vacating the decision and remanding the case for further proceedings.  AR 157.  Specifically, the reason for the decision was that while the ALJ found developmental disorder as a severe mental impairment and found in the Paragraph B criteria that Plaintiff had moderate limitations in concentration, persistence, or pace, the ALJ failed to account for this in the RFC determination.  AR 157.  Specifically, the Council noted that the limitation to 1-2 step tasks was not a mental limitation.  AR 157.  Thus, the Council found that further evaluation was needed for Plaintiff's mental impairments and to see if any resulting limitations were needed.  AR 157-158.

### D.   The ALJ's March 25, 2021 Decision

At step one, the ALJ again found that Plaintiff had not engaged in substantial gainful activity during the period from his alleged disability onset date of June 1, 2012, through his date last insured of September 30, 2017.  AR 18.

At step 2, however, the ALJ determined Plaintiff had the following severe impairments: epilepsy, hyperextension of both shoulders, and obesity.  AR 18.  As for mental impairments, the ALJ found these to be nonsevere.  AR 18-22.

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  AR 22-23.

Next, the ALJ determined that Plaintiff retained the RFC to perform a range of

medium work as follows:

> He can lift and/or carry 50 pounds occasionally and 25 pounds frequently. In an eight-hour workday, he can stand and/or walk for six hours and sit for six hours. He can occasionally climb stairs but he cannot climb ladders, ropes, or scaffolds. He can frequently balance, stoop, kneel, crouch, and crawl. He cannot work around unprotected heights or dangerous moving machines. He can occasionally reach overhead with the right, non-dominant upper extremity.

AR 23. In making his RFC assessment, the ALJ noted he had considered all of Plaintiff's symptoms along with the objective medical evidence and other evidence in the record. AR 23-26.

At step four, the ALJ determined that Plaintiff could perform his past relevant work as a retail cashier or fast-food worker. AR 26. In addition, the ALJ went onto consider an alternative RFC where Plaintiff did have a severe mental impairment. ECF No. 27. Specifically, the ALJ added the following limitations: (1) understand, remember, and carry out unskilled job instructions and one- to two- step tasks; (2) appropriately use judgement and ask questions; (3) appropriately respond to supervision, coworkers, and usual work situations; (4) appropriately deal with changes in a routine work setting; and (5) have occasional, brief contact with the public. AR 27. With these additional limitations, the ALJ concluded that past work could not be performed but Plaintiff could still perform other jobs of significant numbers in the national economy. AR 27. As such, the ALJ concluded Plaintiff is not disabled as defined in the Social Security Act. AR 27.

III. **LEGAL STANDARD OF REVIEW**

The Social Security Act provides for judicial review of a final agency decision denying a claim for disability benefits. 42 U.S.C. § 405(g). A reviewing court will set aside a denial of benefits only when the ALJ decision is "based on legal error or not supported by substantial evidence in the record." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (*quoting Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir.

2003)).  Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *see Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (quotation and citation omitted).  It is a "highly deferential" standard of review.  *Valentine v. Astrue*, 574 F.3d 685, 690 (9th Cir. 2009).  However, the Court must consider the entire record, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and it "may not affirm simply by isolating a specific quantum of supporting evidence."  *Garrison v. Colvin*, 759 F3d. 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  *Vasquez v. Astrue*, 547 F.3d 1101, 1104 (9th Cir. 2008) (internal quotations and citation omitted).  If the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld.  *Molina*, 674 F.3d at 1111.  It is not the Court's role to reinterpret or re-evaluate the evidence, even if a re-evaluation may reasonably result in a favorable outcome for the plaintiff.  *Batson*, 359 F.3d at 1193.  Moreover, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ.  *Molina*, 674 F.3d at 1121.

## IV.   DISCUSSION

Plaintiff contends the ALJ erred in six respects: (1) by failing to following the Appeals Council's remand order; (2) by using the wrong standard in weighing the medical evidence; (3) by focusing on Plaintiff's lack of treatment; (4) the record being incomplete due to lack of audio; (5) failing to perform any pain analysis; and (6) by failing to support the decision by substantial evidence.  ECF No. 11-1.  The Court will address each of these arguments below.

### A.   Remand Based on Missing Hearing Testimony

First, Plaintiff argues that the record is incomplete because a portion of the audio from the hearing is missing.  ECF No. 11-1 at 6.  Thus, this portion of the hearing was

not transcribed into the transcript, and is not part of the record in this case.  Plaintiff represents to the Court that he was not aware of this missing portion of the record until it was filed in this case.  *Id.*  The testimony that is missing appears to be "almost the entirety of [Plaintiff's] counsel's questioning of [him], including pain testimony, financial hardship, etc."  *Id.*  Plaintiff argues that his case should be remanded on this basis.  *Id.*

Cases are clear that where the entirety of a hearing transcript is missing from the record, remand to the ALJ for a new hearing is required.  *See, e.g.*, *Luce v. Astrue*, No. C08-5421RBL, 2008 WL 4739774, at *1 (W.D. Wash. Oct. 24, 2008); *Sucharski v. Astrue*, No. 08-C-0284, 2008 WL 2367097, at *1 (E.D. Wisc. June 9, 2008) ("Loss of a hearing tape constitutes good cause for a sentence six remand"); *Montero v. Astrue*, No. 07-cv-1704-MRK-WIG, 2008 WL 918456 (D. Conn. Mar. 26, 2008) ("the Commissioner's inability to locate the record constitutes good cause for remanding the matter so that the record can be located or a new hearing held before the ALJ."); *Dudley v. Astrue*, 246 F. App'x 249, 252 (5th Cir. 2007); *Austermiller v. Comm'r of Soc. Sec.*, No. 3:10CV1697, 2011 WL 53059, at *1 (N.D. Ohio Jan. 7, 2011); *Gonzales v. Comm'r of Soc. Sec.*, No. 08-14547, 2009 WL 3562621, at *1 (E.D. Mich. Oct. 28, 2009).  Indeed, this situation was contemplated by Congress:

> [T]here are sometimes procedural difficulties which prevent the [Commissioner] from providing the court with a transcript of administrative proceedings. Such a situation is an example of what could be considered "good cause" for remand. Where, for example, the tape recording of claimant's oral hearing is lost or inaudible, or cannot otherwise be transcribed . . . good cause would exist to remand the claim to the [Commissioner] for appropriate action to produce a record which the court may review.

*Evangelista v. Secretary of Health and Human Serv.*, 826 F.2d 136, 141 (1st Cir. 1987) (quoting H.R. Rep. No. 96-144, at 59 (1980)); *see Hawrelak v. Colvin*, No. 13-03026, 2013 WL 6247358, at *2 (C.D. Ill. Nov. 26, 2013).  In these cases, "without a transcript of the administrative proceedings, the Court will be unable to meaningfully review the case."  *Id.* at *2.

Similar reasoning has been applied to situations where a portion of the transcript is missing.  For example, in *Carrington v. Heckler*, 587 F. Supp. 61, 61–62 (M.D. Ga. 1984), the hearing transcript was filed with the court, but the word "inaudible" appeared 66 times in the transcript of 26 pages and the inaudible periods lasted up to 1.5 minutes. The missing testimony consisted of testimony by the applicant, his wife, his attorney, and the ALJ.  *Id.*  The Court remanded the case for rehearing because "a substantial part of the verbal testimony [was] missing" so "the court can reach no decision on whether the Secretary's decision was supported by substantial evidence."  *Id.*  Similarly, in *Pratts v. Chater*, 94 F.3d 34, 37–38 (2d Cir. 1996), the hearing transcript was "significantly compromised by the failure to transcribe a portion of [the medical expert's] testimony." Finding that the ALJ referenced the expert's testimony in her decision, because of the missing transcript, the court concluded that the "bases for these conclusions were lost" to the Appeals Council and reviewing courts and therefore, the court could not say if the ALJ's decision was supported by substantial evidence.  *Id.*  Finally, and perhaps most analogous to the situation here, in *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984), the testimony before the ALJ "reveals ten instances where the court reporter has marked [the claimant's] responses to the ALJ's questions as 'inaudible.'"  The missing testimony was related to claimant's experiences during his "black-outs" and totaled "in excess of five minutes of testimony."  *Id.*  Even though it was not clear to the reviewing court "[w]hether or not the ALJ was cognizant of the claimant's responses to those questions," the court still found it significant that "he did not have them before him in the form of a transcript of the hearing" and ordered that the missing information be elicited on remand. *Id.*

Here, the hearing transcript shows that the ALJ finished questioning Plaintiff and his attorney had just started his questions.  AR 66.  After a couple of questions, the audio cuts out:

[Questions by Plaintiff's Attorney]

Q: You don't know. Okay. Do you know what accredited means?

A: No.

Q: Okay. Just tell me the truth. Don't try to guess what you want me --

(Audio cuts out at 11:31 a.m.)

VE: I have Cashier, 211.462-010, SVP 2, light. And then I have Fast Food Worker, 31~.472-010, SVP 2, light.

ALJ: Okay.

(The vocational expert, NELLY KATSELL, having been first duly sworn, testified as follows:)

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q I'm going to ask you some hypothetical questions, so just bear with me for a moment here.

HA: Hello, Judge, I hate to interrupt, but I have a banner at the top of the -- of my computer saying input audio buffer overflow. It says your computer may not have enough resources to record, but it appears that it's still recording, Judge.

ALJ: Do you want to get some clarification from one of our technical experts to tell you what that specifically means? I don't want to have to redo this hearing if I can help it.

HA: Would you like me to pause the hearing, Judge?

ALJ: Yeah. Folks, yeah, why don't we -- folks, why don't we pause, and do you need to -- can you do that by instant messaging, or do you need to make some phone calls, Lisa?

HA: I can instant message Kevin or Joanne, Judge.

ALJ: Okay. Folks, let's pause the hearing. We're obviously experiencing some potential technical difficulties. Let's just hold for a few moments and I know we're already running late, but thanks for being patient. I don't want to lose this recording if we are having technical problems. So, let's just pause and hopefully we'll be good to go in just a few minutes. Lisa, let's pause the recording and folks, please don't say anything, and Lisa, let me know.

1    HA: Okay, Judge, thank you.

2    ATTY: We'll standby, Your Honor.

3    (Off the record.)

4    (On the record.)

5    ALJ: All right, thank you, Counselor, and thank you, Mr. Rodgers. We could
6    not get a hold of our technical experts. So, I'm going to hopefully, you
     know, keep my fingers crossed here and hopefully we'll be able to complete
7    the hearing without any recording problems. It sounds like we are recording,
8    but there might be some capacity issue, but it sounds like we're still good to
     go. So, having said all that, you're okay with continuing or proceeding
9    again, Mr. Reichman?

10
11   ATTY: Yes, Your Honor.

12   ALJ: Okay. Thank you, sir. All right. We were taking Ms. Katsell's
13   testimony and let me ask some hypothetical questions.

14   AR 67-69.  The ALJ then continued with taking the testimony of the VE, which

15   continued for 4 pages.  AR 69-72.  The hearing concluded at 11:52 a.m.  AR 73.

16        Thus, the missing testimony appears to have started when the audio cut out at

17   11:31 a.m., and then continued into the VE's testimony—so presumably includes the

18   remainder of questioning by Plaintiff's counsel.  The transcript does not contain further

19   timestamps, making it unclear to the Court how long the missing testimony lasted.  In

20   light of the uncertainties surrounding the missing testimony and the fact that the missing

21   testimony was that of Plaintiff's own attorney's questioning and Plaintiff's responses, the

22   Court finds that the most prudent course of action would be to remand the case, to allow

23   Plaintiff's counsel to redo his questioning and have a complete record on this issue.

24        Defendant argues that remand is not necessary because Plaintiff has failed to show

25   that he suffered any prejudice from the missing testimony.  ECF No. 12 at 14-15.

26   Specifically, Defendant argues that the pain testimony and financial hardship was already

27   considered by the ALJ from other evidence.  *Id.*  However, the cases that have remanded

28   based on portions of missing testimony do not rely on prejudice solely as the basis for

remand, but rather the importance of a complete record for the reviewing court to evaluate the entirety of the evidence to determine if the ALJ's decision was supported by substantial evidence.  Thus, even where the ALJ may have considered the missing evidence in reaching her decision, eliminating the concern for prejudice, missing testimony can still require remand.  *See Mimms*, 750 F.2d at 186.  Furthermore, here, the Court does not know what questions were asked by Plaintiff's counsel or what Plaintiff's responses were, so it cannot determine prejudice.

Thus, the Court **RECOMMENDS** that the case be remanded for rehearing to provide Plaintiff's counsel an opportunity to re-question Plaintiff.

## B.    The ALJ Complied with the Appeals Council's Order[3]

Second, Plaintiff argues that the ALJ failed to adhere to the Appeals Council's order on remand because he failed to order another Consultative Examiner to evaluate Plaintiff.  ECF No. 11-1 at 3.  Specifically, Plaintiff argues that the Appeals Council ordered "updating the record in this case, including having another consultative exam by a new consultative examiner."  *Id.*

On remand, an ALJ must comply with the order of the Appeals Council.  *See* 20 C.F.R. § 404.977(b) ("The administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order.").  An ALJ who "fails to take an action ordered by the Appeals Council or takes an action that is "inconsistent with" the Appeals Council's remand order commits legal error."  *David Allen S. v. Saul*, No. 2:19-CV-00376-FVS, 2021 WL 907103, at *5 (E.D. Wash. Mar. 9, 2021).

Here, the Appeals Council stated on remand:

"The hearing decision finds developmental disorder as a severe mental impairment and finds in the B-criteria that the claimant has moderate limitations in concentration, persistence, or pace. There are no

---

[3] Because the Court issuing this Order on Report and Recommendation to the District Judge, the Court will address the remainder of Plaintiff's arguments.  The remainder of this Order will consider the record as complete, and make recommendations on this assumption.

corresponding mental limitations in the residual functional capacity. A limitation to unskilled 1-2 step tasks is not a mental limitation.  However, a review of the record shows that the rationale given to support the moderate B-criteria finding actually do not support any limitations. Accordingly, further evaluation of the claimant's mental impairments and any resulting limitations is needed."

AR 157.  Upon remand, the ALJ was ordered to:

"Obtain additional evidence concerning the claimant's mental and physical impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512 and 416.912). The additional evidence may include, if warranted and available, consultative examinations with psychological testing and medical source opinions about what the claimant can still do despite the impairments."

*Id.*

This language from the Appeals Council's order does not expressly direct the ALJ to order another consultative examination.  The Court finds that this case is similar to the situation in *Allen*.  There, the remand order stated that the ALJ "may not use administrative res judicata as the basis for dismissing a request for hearing" and ordered the ALJ to "issue a decision on the merits of Plaintiff's request for hearing on his application."  *Allen*, 2021 WL 907103, at *3.  The *Allen* court rejected the plaintiff's argument that this order required the ALJ to conduct a *de novo* hearing on remand.  *Id.* at *5 ("[T]o the extent that Plaintiff contends that the ALJ failed to comply with the Appeals Council remand order because he was not allowed to testify a[t] the March 2019 hearing, this argument is unavailing.").  In contrast, courts have found that the ALJ committed legal error in not following the remand order where there was a clear failure to follow an express direction.  *See, e.g.*, *Trujillo v. Astrue*, No. CV 11-1220 SS, 2011 WL 5870080, at *6 (C.D. Cal. Nov. 22, 2011) (finding the ALJ erred where the remand order ordered that "[t]he claimant's credibility and residual functional capacity should be reevaluated" but the ALJ failed to do so and stated that "I note that neither the District Court nor the Appeals Council objected [to] my analysis of the objective medical record

nor the residual functional capacity found"); *Ischay v. Barnhart*, 383 F. Supp. 2d 1199, 1213-19 (C.D. Cal. 2005) (finding the ALJ erred where remand order explicitly found that the plaintiff "could not return to his previous work" and directed the ALJ to "obtain further vocational expert testimony to assist the ALJ in resolving the issue of vocational adjustment" and did not permit ALJ to revisit the RFC determination).

Further, the *Allen* court found it instructive that after the ALJ denied the request for benefits again on remand, the plaintiff again sought review of the decision to the Appeals Council, arguing that the ALJ failed to follow the remand order. 2021 WL 907103, at *6. However, the Appeals Council that time denied the request. *Id.* Similarly here, Plaintiff sought review of the second ALJ decision, arguing as one of the bases that the "ALJ erred in not ordering new CE after being aware prior CE was performed without significant medical history" and "ALJ reliance on CE who had incomplete record and who did not even know triggering event of psychological problems fails to meet substantial evidence standard." AR 257. The Appeals Council did not order review based on these reasons. AR 1.

Thus, the Court **RECOMMENDS** that Plaintiff's argument that the ALJ committed error on this basis be **DENIED**.

## C. The ALJ Did Not Apply the Wrong Standard in Weighing Physician Opinions

Third, Plaintiff argues that the ALJ clearly used the wrong standard in weighing the medical evidence. ECF No. 11-1 at 4.

The parties agree that, because Plaintiff's application was filed on November 14, 2016, the pre-2017 regulations regarding evaluation of medical evidence apply to the case. *Id.*; ECF No. 12 at 13. Specifically, the ALJ should have applied the framework set out in 20 C.F.R. §§ 404.1527 and 416.927. Under that framework, the medical opinion of a treating physician was given controlling weight so long as it was well-supported by medically acceptable clinical and laboratory techniques and was not inconsistent with the other substantial evidence in claimant's medical record. *Revels v.*

*Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting 20 CFR §§ 404.1527(c)(2)).

Here, while Plaintiff argues that the ALJ failed to follow this framework, the ALJ does explicitly state in his opinion that "[t]he undersigned also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927."  AR 23.  Further, while Plaintiff argues that the ALJ fails to "discuss or opinion as to why the treating physicians were not entitled to controlling weight in any way," he fails to identify which treating physicians he is objecting to.  ECF No. 11-1 at 5.  A review of the ALJ's opinion does not show that he discounted the opinion of any treating physician. *See* AR 23-26.  While Plaintiff argues that the ALJ's lack of mention of the § 404.1527 and § 416.927 factors is evidence that the ALJ "presumably appl[ied] the 2017 weigh[]ing," these factors only need to be discussed where a treating physician's opinion is not given controlling weight.  *See Revels*, 874 F.3d at 654 ("When a treating doctor's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record.").  This alone is not sufficient to sustain the allegation that the ALJ failed to apply the correct framework.[4]

Thus, the Court **RECOMMENDS** that Plaintiff's argument that the ALJ committed error on this basis be **DENIED**.

### D.   The ALJ Sufficiently Addresses Lack of Treatment

Fourth, Plaintiff argues that the ALJ focuses improperly on Plaintiff's non-compliance with seizure medication as discounting his seizures when Plaintiff's non-compliance was due to his not having the insurance or money to get the medication.  ECF No. 11-1.

Plaintiff is correct that the ALJ cannot deny benefits to a claimant who fails to obtain medical treatment that would ameliorate his condition if he cannot afford that

---

[4] To the extent that Plaintiff's argument is that the ALJ's opinion fails to meet the substantial evidence standard based on his evaluation of the physicians and medical evidence, that will be addressed separately in this Order.

treatment.  *See Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995) (finding that amputee who could not afford prosthesis should be found disabled even if prosthesis would ameliorate his condition).  However, the ALJ's treatment of Plaintiff's non-compliance due to inability to pay was proper.  During his review of Plaintiff's medical history, the ALJ noted that there were a few instances where Plaintiff experienced seizures (in November 2015, October 2016, and March 2017) when he was not taking his medication. AR 24.  However, since then, Plaintiff has been on medication and the ALJ considered his limitations. During the hearing, the ALJ elicited testimony from Plaintiff that he was taking medications for his seizures as prescribed and was not having any side effects.  AR 60-61.  Further, Plaintiff testified that he was on Medi-Cal.  AR 63.  In the seizure questionnaires that Plaintiff filled out, he answered "yes" to the question on whether he always takes his medications and "never" to the question of whether he ever runs out of medications.  AR 289, 307.  Thus, nothing in the testimony, as it stands, indicates that Plaintiff is not able to afford medication to address his seizures going forward.  The ALJ addresses this situation in his opinion.  *See* AR 25-26 ("The above-discussed medical evidence does not suggest that either his seizure disorder or any medication side effects significantly limited the claimant's physical residual functional capacity for any period of at least 12 consecutive months. The undersigned acknowledges that at times, financial constraints, lack of insurance, and confusion contributed to the claimant's medication noncompliance.  Nonetheless, he testified in November 2020 to having insurance, which is also reflected in the medical record.  Further, the medical records cited above establish that the claimant's seizure disorder was effectively managed with medication. The preclusions of exposure to unprotected heights, dangerous moving machinery, ladders, ropes, and scaffolds adequately address this impairment.").

Thus, the Court **RECOMMENDS** that Plaintiff's argument that the ALJ committed error on this basis be **DENIED**.

### E.    The ALJ Did Not Fail to Address Pain Analysis

Next, Plaintiff argues that the ALJ erred in not performing any analysis of

Plaintiff's pain testimony.  ECF No. 11-1 at 6.  The case that Plaintiff cites for this argument recites the two-step process for determining whether a claimant's testimony regarding subjective pain or symptoms is credible.  First, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  Second, "if the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'"  *Id.*

Upon review of the ALJ's opinion, the Court finds that the ALJ did cite to this two-step analysis and perform the analysis under this framework.  AR 24 ("After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record, for the reasons explained in this decision.").  The ALJ then reviews the medical record, and discusses Plaintiff's subjective descriptions of his symptoms and pain:

- "At the October 2018 hearing, the claimant testified that he could carry about 20 pounds, while in his November 2020 testimony, he affirmed that he could carry a gallon of milk or water with his left, dominant arm but he did not believe he could do so with his right arm.  Also in November 2020, he estimated that he could sit for about one hour before having to get up and that he could stand or walk for one hour at a time.  However, the medical record includes no significant, persistent objective findings to support the claimant's alleged limitations on lifting, carrying, sitting, standing, and walking.  Further, consistent with his testimony that he did not drive, various medical records indicate that he walked regularly."

- "As to the hyperextension in his shoulders, the claimant only occasionally complained of shoulder pain, and positive objective findings of tenderness and "severely restricted" range of motion on the right were noted just once, in June 2016.  Accordingly, the conclusion that he could lift and/or carry 50

pounds occasionally and 25 pounds frequently is reasonable. Additionally, the limitation to occasional overhead reaching with the right arm considers the related objective evidence as well as the claimant's November 2020 testimony that his right shoulder was more painful."

AR 25.  Thus, the ALJ does mention Plaintiff's subjective complaints regarding his symptoms and pain.[5]

Thus, the Court **RECOMMENDS** that Plaintiff's argument that the ALJ committed error on this basis be **DENIED**.

### F.    The ALJ's Opinion is Supported by Substantial Evidence on this Record

Finally, Plaintiff argues that the ALJ's opinion is not supported by substantial evidence.  ECF No. 11-1 at 6-7.  Specifically, Plaintiff argues that the ALJ failed to provide "clear and convincing reasons to reject the uncontroverted medical opinion of [Plaintiff's] treating physicians."  *Id.* at 7.  Plaintiff also argues that the ALJ fails to address that the state agency reviewers come to different conclusions that the treating sources.  *Id.*

Plaintiff does not identify which treating physicians he believes were not given adequate weight by the ALJ.  As to his physical impairments, the primary physician discussed by the ALJ was Plaintiff's neurologist, Dr. Khamishon.  AR 24-25.  However, the ALJ does not discount Dr. Khamishon's opinion.  Rather, the ALJ reviewed the record from Dr. Kamishon, along with the hospital records for Plaintiff's seizure episodes, and concluded that many episodes were caused by noncompliance with medication.  AR 24.  Reviewing the more recent visits with Dr. Kamishon, the ALJ recited his notes indicated that Plaintiff's seizures became managed well once he switched to Depakote.  AR 24; AR 724 (noting no seizures on May 21, 2015 and that "[i]ncreasing Depakote seems to work well;" noting on October 28, 2015 no seizures;

---

[5] This argument that the decision "does not contain any analysis of the Claimant's pain testimony" is differentiated from an argument that the reasons the ALJ gave to discount them to be insufficient.  To the extent that Plaintiff is making that argument, the Court addresses it below regarding whether the ALJ's decision was ultimately supported by substantial evidence.

noting on April 28, 2016 no seizures and "doing well;" noting on November 8, 2017 "no seizures" and that "Dep[akote] is working really well" and that his mom wanted him "to stay on Dep (it works);" noting on May 17, 2018 "no seizures" and went to Japan without incident).  Even though Plaintiff experienced a couple of breakthrough seizures while on Depakote, these appeared to be associated to changes in dosage.  AR 24; 724.  Thus, the ALJ does not appear to reject any of Dr. Khamishon's notes or opinions—rather, the ALJ found that he supported the ALJ's conclusion that Plaintiff was not significantly impaired on account of his seizures since his symptoms were well managed with medication and he was not experiencing seizures anymore with any regularity.  Moreover, the ALJ included in his RFC a limitation that Plaintiff could not be exposed to unprotected heights, dangerous moving machinery, ladders, ropes, or scaffolds.  AR 26.

Plaintiff's other physical impairments include obesity and his right shoulder injury.  As to obesity, Plaintiff's medical records include visits that he had regarding this issue.  However, the records do not contain any opinions as to any limitation he had as a result of obesity—the visits targeted educating Plaintiff regarding nutrition and exercise.  As for Plaintiff's right shoulder injury, medical records noted that his right shoulder had severely restricted range of movement.  AR 603.  He was referred to orthopedics, and given Motrin and told to ice the area.  AR 604.  His medical records do not include any further opinions as to the limitations caused by this injury.  The ALJ gave great weight to the state agency consultants, Drs. Do and Michelotti, who opined that claimant could lift and/or carry 50lbs occasionally and 25lbs frequently but limited his reaching overhead with his right upper extremity.  AR 25.  These opinions do not contradict any other opinions in Plaintiff's medical records, and the ALJ gave reasons for supporting the RFC.  The ALJ noted that Plaintiff was left-handed, so the right hand was his non-dominant hand.  The ALJ also noted that during the first hearing in 2018, Plaintiff testified that he could carry about 20lbs, and he testified in the 2020 hearing that he could carry a gallon of milk (on average 8lbs) in his left hand but not right arm.  AR 25.  The ALJ also noted that the RFC restrictions are supported because Plaintiff only occasionally complained

about shoulder pain, and this was only documented once in one visit on June 21, 2016. AR 603-604.

As for mental limitations, the ALJ reviewed the treatment notes from Plaintiff's therapist, noting that he was diagnosed with anxiety and depression, but the notes did not include any remarkable mental status findings. AR 19. The ALJ observed that Plaintiff stopped therapy in 2016, noting that his therapy goals were met, and after he resumed therapy in 2018, the case was again closed in 2020 and Plaintiff declined antidepressants. AR 19. The ALJ did not reject any opinion of Plaintiff's therapist. The ALJ gave great weight to consultative examiner Dr. Vanderburgh, and some weight to the state agency consultants' opinions. AR 20-21. The main point of discrepancy between these assessments was over whether Plaintiff had moderate or mild limitations in the areas of concentrating, persisting, or maintaining pace, limitations to 1-2 step instructions, and reduced public contact. AR 21. The ALJ found that these limitations were not supported by the record, partly because the state agency reports were from 2017 and did not have the benefit of having more recent records which suggested minimal treatment and insignificant functional limitations. AR 21. The Court finds that the ALJ's assessment of Plaintiff's mental limitations is supported by the record. Moreover, the ALJ took the additional step of including another hypothetical to the VE to include the mental limitations found by the state agency consultants: Plaintiff could understand, remember and carry out unskilled job instructions and simple tasks, can use judgment and ask questions, can respond to supervision, coworkers, and usual work situations, can deal with changes in a routine work setting, but can only have occasional or limited public interactions. AR 69-70. The VE testified that such a person could no longer perform Plaintiff's past work, but could still perform other light work at the SVP-2 level, such as garment folder, garment bagger, conveyor bakery worker, and medium work at the SVP-2 level, such as garment maker, laundry worker, or packager hand. *Id.* Thus, even with additional mental limitations, the ALJ found that Plaintiff would not be disabled. AR 27.

Because the Court finds that the ALJ's assessment of the medical evidence and

determination of the RFC is supported by substantial evidence, the Court **RECOMMENDS** that Plaintiff's argument that the ALJ committed error on this basis be **DENIED**.

## V.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART**, and the case be **REMANDED** for further administrative proceedings consistent with this opinion.  See 42 U.S.C. § 405(g).  On remand, the ALJ should provide Plaintiff's counsel an opportunity to re-question Plaintiff and ensure such testimony is part of the reviewable administrative record.

This Report and Recommendation is submitted to the United States district judge pursuant to 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve a copy on all parties by **February 23, 2023**.  The document should be captioned "Objections to Report and Recommendation."  Any response to the objections shall be filed and served by **March 2, 2023**.  The parties are advised that any failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *Baxter v.  Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  February 9, 2023

Hon. Nita L. Stormes
United States Magistrate Judge