1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CEDRIC RODGERS,<br><br>                              Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting<br>Commissioner of Social Security,<br><br>                              Defendant. | Case No.:  21-cv-1534-GPC-NLS<br><br>**ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION; GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND REMANDING THE CASE**<br><br>**[ECF No. 11]** |

On August 30, 2021, Plaintiff Cedric Rodgers ("Plaintiff" or "Rodgers") filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Commissioner of Social Security's final decision denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"). ECF No. 1 ("Compl.").

On February 10, 2022, Plaintiff filed a Motion for Summary Judgment. ECF No. 11. On March 10, 2022, Defendant filed a Response, (ECF No. 12), and on March 24, 2022, Plaintiff filed a Reply, (ECF No. 14). On February 9, 2023, Magistrate Judge Nita

1

L. Stormes issued a Report and Recommendation ("Report") recommending that the Court grant in part and deny in part Plaintiff's Motion for Summary Judgment. ECF No. 15. Having reviewed the Parties' arguments, the record, and the applicable law, and the Report, the Court **ADOPTS IN PART** the Magistrate Judge's Report, **GRANTS IN PART** Plaintiff's Motion for Summary Judgment, and **REMANDS** the case to the Commissioner of Social Security for further administrative proceedings.

**BACKGROUND**

### I.      Procedural History

Plaintiff filed a Title XVI application for supplemental security income and a Title II application for Social Security Disability Insurance on November 15, 2016. ECF No. 10, Administrative Record ("AR") at 260-269.[1] His application states his disability began on June 1, 2012. *Id.* at 259, 268.

Plaintiff's claim was initially denied on February 27, 2017, (*id.* at 159), and was denied on reconsideration on May 31, 2017, (*id.* at 164). On June 21, 2017, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), (*id.* at 169), and a hearing was held on October 3, 2018, (*id.* at 36). Plaintiff did not have a lawyer at this hearing and stated that he did not want to reschedule the hearing to find a lawyer because he wanted to get "the hearing done as soon as possible." *Id.* at 37. Plaintiff testified at the hearing and a Vocational Expert ("VE") provided testimony as to the type of work that could be performed under various hypotheticals. *Id.* at 36-53. On February 14, 2019, the ALJ denied Plaintiff's applications, finding that he was not disabled as defined in the Social Security Act. *Id.* at 138-151. Plaintiff appealed, and the Appeals Council vacated and remanded the ALJ's decisions stating that, among other things, further evaluation of Plaintiff's "mental impairments and any resulting limitations is needed." *Id.* at 157.

---

[1] Page citations refer to pagination on the Administrative Record PDF.

On November 9, 2020, the ALJ held a second hearing in which Plaintiff was represented by counsel. *Id.* at 54-73. Plaintiff again testified, as well as a vocational expert. *Id.* On March 25, 2021, the ALJ denied Plaintiff's applications after finding again that Plaintiff was not disabled within the meaning of the Social Security Act. *Id.* at 12-34. Plaintiff appealed, and on June 26, 2021, the Appeals Council denied Plaintiff's request for review. *Id.* at 1-6. Plaintiff timely filed in this Court.

## II.     Plaintiff's Personal and Medical History

Plaintiff was born on July 9, 1986 and is presently 36 years old. *Id.* at 40. He attended high school at "Casa by the Sea," which was a "tough love high school in Tijuana" that was shut down by the Mexican police for egregious abuse. *Id.* at 59; *see also id.* at 390-398 (discussing Casa by the Sea and its harsh punishment, lack of academic programming, and Plaintiff's personal experience at institution). Following the raid, Rodgers was enrolled in Serra High School in Tierrasanta (now Canyon Hills High School); he was given a high school diploma after less than a year "based in large part of some understandably generous interpretations of his prior 'education' during his three years at the 'tough love' camp." *Id.* at 386. He received an Associate's Degree from Associated Technical College in San Diego. *Id.* at 65. Rodgers started attending California College of San Diego in National City but dropped out when he "had a seizure at the bar and grill next door." *Id.* at 40.

Plaintiff previously worked for two years, starting in 2008, as a cashier at CVS/Long's Drugs. *Id.* at 671. The job started full-time and was cut down to part-time. *Id.* He left this job due to a conflict with the manager. *Id.* at 48. After that, Plaintiff worked in 2016 as a sign holder for a restaurant a couple of hours a day for about 4-5 months. *Id.* at 47-48, 671. He left the job because "business was slow and they did not need him anymore." *Id.* at 671.

Plaintiff suffers from three conditions relevant to his application: (1) epilepsy; (2) mental health and cognitive issues; and (3) overextension in both shoulders. *Id.* at 74. At the time of the second hearing, Rodgers testified that it had been "a couple of years" since he was hospitalized for a seizure, and that he was regularly taking seizure medication. *Id.* at 61. He states that he sometimes has minor twitching episodes that are "not severe enough to go to the hospital." *Id.* at 65. At the second hearing, Plaintiff said he had a minor twitching episode two months prior. *Id.* at 65. Plaintiff testified that he has some depression and PTSD related to his time at Casa by the Sea. *Id.* at 61-62. Plaintiff also states that he has trouble concentrating, staying focused, and getting along with other people. *Id.* at 45-46, 63. At the first hearing Plaintiff stated he had Obsessive Compulsive Disorder and that this manifested in rituals and routines performed prior to leaving the house. *Id.* at 47. He was not taking medication for any mental health impairments. *Id.* at 62.

Further, Plaintiff testified that he has hyperextension in both of his shoulders, and that he could not lift his arms higher than his shoulder. *Id.* at 60, 62. At the first hearing, Plaintiff stated he thought he could lift a bag of potatoes with each hand. *Id.* at 44. At the second hearing Plaintiff testified that he could carry a grocery bag in his left hand, but nothing more, and that he could not comfortably lift or carry a gallon of milk in his right hand. *Id.* at 64. At the first hearing, Plaintiff stated he could sit "a good couple hours" at a time and walk "maybe two hours" at a time. *Id.* at 45. At the second hearing, Plaintiff testified he could sit for an hour before needing to move around and that he could stand or walk for an hour at a time. *Id.* at 65.

At the time of the second hearing, Plaintiff was living alone at the Peachtree Inn. *Id.* at 63. He does not have a driver's license. *Id.* at 60. He receives CalFresh, Medi-Cali, and financial assistance from his mother to pay his rent. *Id.* Throughout the day, Plaintiff states he mostly stays at home, watches TV, reads, and listens to music. *Id.* at 65. He does

4

not cook because he only has a microwave, but he is able to grocery shop for himself. *Id.* at 66.

### III.   Plaintiff's Medical Records

#### a.  Seizures

Plaintiff experienced his first seizure at 18 years old. *Id.* at 289. He states he randomly has seizures and will lose consciousness and have convulsions. *Id.* He states he is able to resume normal activities after 1-2 days. *Id.* His medical records revealed multiple hospital admissions following seizures in the relevant time period. *See e.g.*, *id.* at 290.

Plaintiff was admitted to the hospital for a grand mal seizure on March 18, 2008. *Id.* at 939-83. He was observed to have a "3-minute episode of body stiffening, poor responsiveness, and upper extremity shaking." *Id.* at 939. He was given Dilantin and referred for neurological evaluation. *Id.* at 941. On September 15, 2011, Plaintiff suffered a seizure while walking to work and sustained a fall to his face. *Id.* at 492. On October 11, 2011, Plaintiff suffered seizure while at work and stated at the hospital that he could not afford his medication. *Id.* at 483. On November 13, 2011, Plaintiff had another seizure while at work. *Id.* at 477. On February 25, 2012, Plaintiff had a seizure at work, and again stated he was noncompliant with his medication because he could not afford it. *Id.* He was prescribed a less expensive medication. *Id.* at 475.

On July 16, 2012, Rodgers had a minute-long seizure while crossing the street, which caused him to fall and hit his head. *Id.* at 457. At the hospital he stated he had not taken his medication in 2-3 weeks because he felt "he doesn't need them." *Id.* at 460. During this visit he received a neurological consult. The neurologist stated that it did not appear that the medication was necessarily ineffective, but rather he was noncompliant. *Id.* at 464. He was described as "very mentally slow" and "simplistic in answers and content." *Id.* at 466. He was prescribed an increased dose of his seizure medication. *Id.*

On September 8, 2012, Plaintiff was found by neighbors in his apartment complex after what appears to have been a seizure. *Id.* at 454. He states he had not taken his medication that morning. *Id.* at 455. Ten days later, Plaintiff had another seizure lasting one minute. *Id.* at 452. He stated that he had been taking his medication but that it was possible he had missed a dose. *Id.*

On October 10, 2012, Plaintiff suffered a one-minute seizure at his living complex and fell, causing an acute nasal bone fracture. *Id.* at 443. He stated that he had run out of his medication two days prior, but because he did not have insurance and minimal financial resources, he was not able to get a refill. *Id.* at 440. He stated that he did not have a primary physician and "usually only has a script for 1 month following [discharge] from the hospital." *Id.*

Plaintiff experienced another seizure on May 12, 2013. *Id.* at 435. He stated he had been non-compliant with the medication for nine months at the time. *Id.* On March 7, 2014, Rodgers suffered a two-minute seizure and sustained a laceration to the nose and multiple nasal bone fractures. *Id.* at 428. During this visit he stated he had suffered a seizure about a week prior, but he was not hospitalized following that episode. *Id.* at 430. On December 28, 2014, Plaintiff suffered a seizure at home and was hospitalized. *Id.* at 423. He had fallen and sustained carpet burns and a tongue bite. *Id.* at 425. He denied medication non-compliance and stated he had taken his medication that morning. *Id.* at 423, 425.

On October 27, 2016, Plaintiff had a seizure while at school and was taken to the hospital. *Id.* at 822. He stated that he had been in compliance with his medication regime. *Id.* Plaintiff's seizure questionnaire states that he had two other seizures on April 20, 2017 and March 20, 2017. *Id.* at 289.

Plaintiff has taken a number of different medications in an attempt to control his seizures. He started with Carbamazepine and later tried Keppra, Lamictal, Depakote,

Dilantin, and Divalproex. *Id.* 596, 592, 587, 700. Plaintiff has a history of struggling to afford his medication. *See e.g.*, *id.* at 592 (stating that his insurance had expired, and he was in the process of reapplying); *id.* at 440 (stating he has no primary physician to write a prescription because he is uninsured and that he only has a prescription for the month following his hospital admissions). Thus, although in the medical records Plaintiff is noted to be non-compliant with his medication, it is unclear how much of this non-compliance is due to financial constraints.

From July 2014 to May 2018, Plaintiff was seen by neurologist Dr. Boris Khamishon a few times a year. *Id.* at 697-726. Dr. Khamishon worked with Rodgers on his medication regiment. *See e.g.*, *id.* at 703. An EEG was ordered for Plaintiff on November 2, 2016 and November 9, 2017, both of which came back normal. *Id.* at 727, 728. In the last record the Court has from May 17, 2018, Dr. Khamishon notes that he had no recent seizures and took a trip to Japan "without incidents." *Id.* at 724.

### b. Hyperextended Shoulders

Plaintiff also suffers from overextended shoulders, which cause him pain. On June 21, 2016, he had an appointment for this should pain. *Id.* at 603. The provider noted that his right should was "severely restricted," referred Plaintiff to an orthopedic, and suggested Plaintiff take Motrin and ice the affected area. *Id.* at 604. There does not appear to be any additional records provided as to this ailment, but Plaintiff testified in both of his hearings that he continues to suffer from hyperextension and has limited mobility and utility as a result.

### c. Mental Health and Cognitive Issues

In a record dated April 27, 2016, a provider opined that Plaintiff had "mental retardation" and "depression." *Id.* at 605. His IQ was found to be between 50 and 70. *Id.* at 606.

On July 17, 2015, Plaintiff attended a therapy intake session. *Id.* at 629. The provider noted that Plaintiff had a "history of depression in middle school through high school, which was treated with medication and therapy." Plaintiff stated that he feels "blah" and has a history of not caring about things, social isolation, no motivation, and "overall pessimistic view of the world." *Id.* Plaintiff explained that his social isolation is in part because he gets "really nervous around people and crowds." *Id.* He denied suicidal ideation, homicidal ideation, and psychosis. *Id.* He stated his dad committed suicide in 1994 when he was eight years old. *Id.* He stopped going to school in 8th grade due to depression and became "very volatile, violent, aggressive" and he "refused to shower." *Id.* at 631. Rodgers's mom stated she did not know how to deal with this and sent him to Casa by the Sea. *Id.* His mental exam stated that he was alert and oriented, but had poor hygiene, below average intellect, depressed mood, poor memory, slowed motor skills, and poor judgment and insight. *Id.* at 632.

On July 31, 2015, Plaintiff started regular individual therapy twice a month. *Id.* at 628. On January 15, 2016, the provider noted that treatment would reduce to once per month. *Id.* at 627. On July 22, 2016, Rodgers terminated his therapy sessions. *Id.* at 806.

On February 3, 2017, Dr. Kathy Vanderburgh conducted a psychological evaluation of Plaintiff for the Department of Social Services; Disability Evaluation Department. *Id.* at 668. Vanderburgh noted that he was wearing appropriate clothing, had normal posture and gait, could relate in a pleasant and cooperative manner but was "strongly malodorous." *Id.* at 670. She stated that he has symptoms of depression and anxiety and "has memory impairment and has to write all information down." *Id.* at 671.

Dr. Vanderburgh found that he could bathe and dress independently. *Id.* at 672. His mother picks up his dirty laundry and washes them once per week. *Id.* Vanderburgh found that he was capable of washing dishes and vacuuming, although he did not have to do so currently. *Id.* His mental status examination revealed that his thought process was

8

organized and without hallucinations. *Id.* His speech and tone was normal with adequate response time. *Id.* He was able to focus on tasks during the examination and could recall six digits forward and four digits backwards. *Id.* He could spell "world" forwards and backwards. *Id.*

Dr. Vanderburgh administered tests and found "mild impairment." *Id.* at 674. Overall, she found Rodgers to be "intellectually functioning in the upper low average to average range. The claimant's overall memory for new information is functioning in the low average range. He completes tasks at an appropriate pace." *Id.* She diagnosed him with anxiety and depressive disorder and ruled out pervasive developmental disorder. *Id.* She found him to be able to appropriately interact with others at an age-appropriate level, but that his significant hygiene problems would prevent him from finding employment. *Id.* at 675. The report stated he had no limitations on his ability to understand instructions, sustain ordinary routine, complete simple tasks, complete detailed tasks, or concentrate for two-hour increments. *Id.* Vanderburgh found a moderate limitation on his ability to complete complex tasks. *Id.*

Plaintiff began therapy again on April 18, 2018. *Id.* at 801. At the appointment he expressed his desire to restart therapy because of depression and anxiety symptoms. *Id.* He expressed anxiety around leaving the house, and he worried that he would have a seizure in public. *Id.* He stated he had several public seizures in the past and had been robbed. *Id.* The provider noted depressive disorder, anxiety disorder, and intellectual disability. *Id.* at 804.

At a September 25, 2018 appointment, Rodgers stated he was depressed and anxious about an upcoming court date related to his SSDI benefits and stated he felt "out of body experiences which led to disorientation and vertigo." *Id.* at 797. He declined to start antidepressants and instead opted to continue individual therapy. *Id.* at 798. A treatment plan dated March 4, 2019, states that Rodgers was diagnosed with PTSD and

1    "bereavement, complicated." *Id.* at 914. Plaintiff continued attending therapy sessions

2    until stopping on October 12, 2020. *Id.* at 864.

3        **IV.   State Agency Consultations**

4            **a.  State agency physical consultants**

5          On January 19, 2017 and May 26, 2018, state agency consultants opined that

6    Plaintiff could: occasionally life/carry 50 pounds and frequently life/carry 25 pounds;

7    stand/walk for 6 hours; sit for 6 hours; had no limitation on pushing or pulling;

8    occasionally climb ramps/stairs; never climb ladders/ropes/scaffolds; frequently balance,

9    stoop, kneel, crouch; occasionally crawl; had limited overhead reaching; unlimited gross

10   manipulation handling, fine manipulation fingering and feeling; no visual,

11   communicative, or environmental limitation; no limitations to cold, heat, wetness,

12   humidity, noise, fumes; could not have concentrated exposure to vibration; and should

13   have total avoidance of even moderate exposure to hazards due to seizure disorder. *Id.* at

14   83-85 (Dr. T. Do), 114-16 (Dr. V. Michelotti).

15           **b.  State agency mental consultants**

16         On February 25, 2017 and May 30, 2017, state agency consultants opined that

17   Plaintiff had severe depression and non-severe anxiety and OCD. *Id.* at 80 (Dr. A.

18   Franco), 112 (Dr. H. Abrahimi). The consultants found that Plaintiff had mild limitations

19   in his ability to understand, remember, or apply information; interact with others; and

20   adapt or manage oneself. *Id.* at 81. He had moderate limitations in his ability to

21   concentrate, persist, or maintain pace. *Id.* The consultants noted that Plaintiff was

22   strongly malodorous and had poor hygiene. *Id.* 81. The report stated that Plaintiff could

23   perform simple 1-2 step tasks and semi-skilled work with limited public contact and

24   could otherwise interact/adapt and sustain for a usual workday and week with customary

25   breaks. *Id.* at 81.

26

27                                         10

28

The consultants found there was no significant limitation on Plaintiff's ability to carry out very short and simple instructions; perform tasks within a schedule; sustain ordinary routine; work in proximity to others; and make simple work-related decisions. *Id.* at 85-86. Plaintiff was found to be moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriate with the general public; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. *Id.*

## V.   Vocational Expert Testimony

### a.  First Hearing: Mary Jesko

At the first hearing, the ALJ presented vocational expert Mary Jesko two hypotheticals. First, what work, if any, could an individual perform that is of Claimant's age, education, and past work experience; can lift/carry 50 pounds occasionally or 25 pounds frequently; can sit, stand, and walk for six hours total; has frequent postural capability; is limited to occasional stairs; no ladders/ramps/scaffolds/unprotected heights; no dangerous moving machinery; and right overhead extremity is limited in reaching. The hypothetical individual is further limited to unskilled, one or two steps tasks, and limited public contact. *Id.* at 48-49. Jesko testified that under these facts, jobs existed in the national economy the individual could perform, including lacer, bench assembler, and lens inserter. *Id.* at 49.

The ALJ then noted that Plaintiff testified he could not do any "bilateral over shoulder activity, and his arm movement was limited to no higher than shoulder level. *Id.* The ALJ'S second hypothetical included the following characteristics: lifting/carrying 20 pounds occasionally and 10 pounds frequently; sitting, standing, and walking for two hours at a time; no unprotected heights, dangerous moving machinery, or driving; unable to understand, remember, and carry out simple tasks; cannot do 40-hour workweek on

regular basis; cannot adequately handle work routines or changes or work stressors. *Id.* at 50. Jesko testified no work could be performed under these circumstances. *Id.*

### b.  Second Hearing: Nelly Katsell

At the second hearing, Nelly Katsell testified. *Id.* at 67. The ALJ presented the first hypothetical as an individual with Plaintiff's age, education, and past work; can lift/carry 50 pounds occasionally and 25 pounds frequently; can stand/walk/sit for six hours; can occasionally climb stairs, but no ladders, ramps, or scaffolds; cannot work around unprotected heights or dangerous moving machinery; can occasionally reach overhead with the right arm. *Id.* at 69. Under these facts, Katsell testified Plaintiff could return back to his past work of cashier and fast food worker. *Id.*

The second hypothetical involved the same individual as above but limited to the ability to carry out unskilled job instructions, one-to-two step tasks, and limited public interaction. *Id.* at 69-70. Katsell stated Plaintiff could not return to past work under these circumstances but could perform work as a garment folder, bagger, conveyor bakery worker, garment maker, or laundry worker. *Id.* at 70.

The third hypothetical involved the following facts: an individual of the Plaintiff's same age, education, and past work experience; can only lift/carry eight pounds with left hand and seven pounds with right hand; no lifting/reaching above shoulder level; can sit, stand, walk for one hour at a time; not able to understand, remember, carry out simple job instructions; cannot interact appropriately with others; cannot respond to work routines or changes in routine work setting; cannot work around heights or dangerous machinery; can't do 40-hour workweek. *Id.* at 71. Katsell stated the previously identified jobs could not be performed under these limitations. *Id.* The ALJ then asked if there were any jobs Plaintiff could perform that involve no bilateral reaching above shoulder level. *Id.* Katsell stated there was not because "[t]here's always some reaching above." *Id.*

## VI.   Legal Standards

Under the Social Security Act, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine if a claimant meets this definition, the Social Security Act establishes a five-step sequential analysis. 20 C.F.R. § 404.1520(a); *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004). If the ALJ determines that a claimant is either disabled or not disabled at any step in the process, the ALJ does not continue to the next step. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

The ALJ must perform the following sequential analysis: (1) whether the claimant is "doing substantial gainful activity"; (2) whether claimant has a "severe, medically determinable physical or mental impairment . . . or a combination of impairments that is severe" and that lasted for more than 12 months; and (3) whether the impairment "meets or equals" one of the listings in the regulations. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the applicant's impairment meets or equals a listing, the claimant is disabled. § 404.1520(a)(4)(iii).

If the impairment does not meet or equal a listing, the ALJ must determine the claimant's residual functional capacity ("RFC"). § 404.1520(a)(4)(iv), (e). A claimant's RFC is the most he can still do in a work setting despite impairments. § 404.1545(a). The ALJ must determine whether the applicant retains RFC to perform past relevant work. § 404.1520(a)(4)(iv). If the applicant cannot perform past relevant work, the ALJ must determine at step five whether the applicant can perform any other work that exists in the national economy. § 404.1520(a)(4)(v). The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five. *Bray*, 554 F.3d at 1222-23.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### a.  ALJ Application of § 404.1520(a)(4)(i)-(v)

#### i.  February 14, 2019 Decision

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2012. AR at 144. Second, the ALJ found that Plaintiff had severe impairments in the form of epilepsy, hyperextension of the shoulders, developmental disorder, and obesity. *Id.* His OCD and anxiety were found to be non-severe. *Id.* Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in the regulation. *Id.* at 144-146.

Fourth, the ALJ found that Plaintiff retained the residual functioning capacity ("RFC") to: lift/carry 50 pounds occasionally and 25 pounds frequently; sit/stand/walk for six hours; occasionally climb stairs but not ladders, ramps, or scaffolds; cannot work around unprotected heights or dangerous moving machinery; occasionally reach overhead with right extremity; limited to unskilled 1-2 step tasks; and limited public contact. *Id.* at 146. The ALJ determined that under this RFC, Plaintiff could not perform past work. *Id.* at 149-150.

Fifth and last, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, jobs existed in the national economy that Plaintiff could perform. *Id.* at 150.

#### ii.  Appeals Council Order

Plaintiff requested the Appeals Council review the ALJ's 2019 decision. *Id.* at 157. The Appeals Council vacated the ALJ's decision and remanded for further proceedings. *Id.* The Council stated that although the ALJ found developmental disorder as a severe mental impairment, the ALJ did not account for this in the RFC determination. *Id.* The Council ordered further evaluation of Plaintiff's mental impairments and any corresponding limitations. *Id*

14

### iii. March 25, 2021 Decision

On remand, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since June 1, 2012. *Id.* at 18. Second, the ALJ found that Plaintiff had severe impairments in the form of epilepsy, hyperextension of the shoulders, and obesity. *Id.* at 18. As opposed to the first decision, the ALJ concluded that Plaintiff's mental impairments were non-severe and did not cause more than a minimal limitation in his ability to perform basic mental work activities. *Id.* In arriving at this conclusion, the ALJ placed great weight on Dr. Vandenburgh's February 2007 findings, discussed above. *Id.* at 19-22.

Third, the ALJ found that Plaintiff did not have an impairment or combination of impairment that met or medically equaled the severity of an impairment listed in the regulations. *Id.* at 22.

Fourth, similar to the first decision, the ALJ found that Plaintiff had the RFC to: lift/carry 50 pounds occasionally and 25 pounds frequently; sit/stand/walk for six hours; occasionally climb stairs but not ladders, ramps, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; cannot work around unprotected heights or dangerous moving machinery; and occasionally reach overhead with right extremity. *Id.* at 23. However, contrary to the first decision, the ALJ found that Plaintiff was in fact capable of performing past work as a cashier and fast-food worker. *Id.* at 26. Thus, Plaintiff was not disabled as defined by the Social Security Act. *Id.* at 27.

### STANDARD OF REVIEW

The Social Security Act provides for judicial review of a final agency decision denying a claim for disability benefits. 42 U.S.C. § 405(g). The reviewing court may enter a judgment affirming, modifying, or reversing the Commissioner's decision and may also remand the matter to the Commissioner of Social Security for further proceedings. *Id.* A reviewing court can set aside a denial of benefits only when the ALJ

decision is "based on legal error or not supported by substantial evidence in the record." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017). "Substantial evidence" means more than a "scintilla," but less than a preponderance, or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). When the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Although this is a highly deferential standard of review, the Court must consider the entire record, weighing both the evidence that supports and detracts from the Commissioner's conclusion. *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).

Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b) govern a district court's duties in review of a Magistrate Judge's Report and Recommendation. The district court "may accept, reject or modify, in whole or in part, the findings and recommendations made by the magistrate." 28 U.S.C. § 636(b). The district court need not review *de novo* those portions of a Report to which neither party objects. *See Wang v. Masaitis*, 416 F.3d 992, 1000 n.13 (9th Cir. 2005). When no objections to a Report are made, the district court may assume the correctness of the magistrate judge's findings of fact and decide the motion on the applicable law. *Campbell v. U.S. Dist. Ct. for the N. Dist. of California*, 501 F.2d 196, 206 (9th Cir. 1974). No objections were made to this Report.

## DISCUSSION

Plaintiff's Motion for Summary Judgment argues the ALJ erred in six ways: (1) the record was incomplete due to a lack of audio; (2) the opinion failed to follow the Appeals Council's remand order; (3) the ALJ's reliance on Plaintiff's lack of treatment was improper; (4) the ALJ's decision used the wrong standard to weigh the medical evidence

(5) the ALJ failed to perform pain analysis; and (6) the ALJ's decision was not supported by substantial evidence. ECF No. 11-1.

### I.      The Record is Incomplete Due to a Lack of Audio

Plaintiff argues the case should be remanded because "almost the entirety of Mr. Rodger's counsel's questioning of Mr. Rodgers is missing from the record as the audio stopped recording during the hearing." ECF No. 11-1 at 6. Plaintiff states that this missing testimony included pain testimony and financial hardship testimony. *Id.* Defendant responds that Plaintiff has not demonstrated how the missing testimony prejudiced his case, and thus any error was harmless. ECF No. 12 at 14-15.

Courts have remanded cases when portions of the transcript are missing. *See e.g.*, *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996) (finding that failure to transcribe a portion of the medical expert's testimony was ground for remand and that "[f]aced with such an incomplete record . . . we cannot say the ALJ's decision is supported by substantial evidence"); *Mimms v. Heckler*, 750 F.2d 180, 186 n.1 (2d Cir. 1984) (remanding and finding that the transcript revealed ten instances where "inaudible" was marked in the record and that this gap exceeded five minutes of significant testimony). In *Carrington v. Heckler*, 587 F. Supp. 61 (M.D. Ga. 1984), the court found the record was incomplete because "inaudible" was found sixty-six times throughout the transcript. *Carrington v. Heckler*, 587 F. Supp. 61, 61 (M.D. Ga. 1984). The court noted the inaudible periods lasted up to one minute and thirty seconds and included testimony from the applicant, his wife, and his attorney. *Id.* at 61. The court remanded the case, finding that "[b]ecause a substantial part of the verbal testimony is missing, the entire record is not before the court. Therefore, the court can reach no decision on whether the Secretary's decision was supported by substantial evidence." *Id.* at 61-62 (emphasis in original).

1    Here, the ALJ finished questioning Rodgers and Rodgers's attorney had just

2    started his questioning when the audio cut out. *See* AR at 67. Rodgers's attorney asked

3    Plaintiff if the college he attended was accredited and if Plaintiff knew what accredited

4    meant. *Id.* The transcript notes the audio cut out at that point. *Id.* The transcript resumes

5    with the vocational expert's testimony:

6        Claimant's Attorney: You don't know. Okay. Do you know what accredited

7        means?

8        Claimant: No.

9        Atty: Okay. Just tell me the truth. Don't try to guess what you want me –

10       [Audio cuts out at 11:31 a.m.]

11       Vocational Expert: I have Cashier, 211.462-010, SVP 2, light. And then I have

12       Fast Food Worker, 311.472-010, SVP 2, light.

13       ALJ: Okay.

14       [The vocational expert, NELLY KATSELL, having been first duly sworn, testified

15       as follows:]

16       EXAMINATION OF VOCATIONAL EXPERT BY ALJ

17       ALJ: I'm going to ask you some hypothetical questions, so just bear with me for a

18       moment here.

19       HA: Hello, Judge, I hate to interrupt, but I have a banner at the top of the – of my

20       computer saying input audio buffer overflow. It says your computer may not have

21       enough resources to record, but it appears that it's still recording, Judge.

22       ALJ: Do you want to get some clarification from one of our technical experts to

23       tell you what that specifically means? I don't want to have to redo this hearing if I

24       can help it.

25       HA: Would you like me to pause the hearing, Judge?

26

27                                              18

28                                                          21-cv-1534-GPC-NLS

ALJ: Yeah. Folks, yeah, why don't we – folks, why don't we pause, and do you
need to – can you do that by instant messaging, or do you need to make some
phone calls, Lisa?

HA: I can instant message Kevin or Joanne, Judge.

ALJ: Okay. Folks, let's pause the hearing. We're obviously experiencing some
potential technical difficulties.

. . .

ALJ: All right, thank you, Counselor, and thank you, Mr. Rodgers. We could not
get a hold of our technical experts. So, I'm going to hopefully, you know, keep my
fingers crossed here and hopefully we'll be able to complete the hearing without
any recording problems.

AR at 67-68.

Although no time stamps are provided after the initial cut, it is clear that the
entirety of Plaintiff's own attorney's questioning is missing as well as the beginning
portion of the vocational expert's testimony. The ALJ was aware of the technical
difficulties and paused the hearing while unnamed technical experts attempted to fix the
problem. The ALJ further acknowledged on the record that they were unable to address
the recording problem. *See* AR at 68 ("We could not get a hold of our technical experts.
So . . . I'm going to . . . keep my fingers crossed here . . . .").

The Court agrees with the Magistrate Judge that it cannot tell whether the missing
testimony is prejudicial, because the Court does not know what questions were asked and
what answers were given. Thus, the Court **ADOPTS** the Magistrate Judge's
recommendation and **REMANDS** the case on this issue to allow Plaintiff's counsel an
opportunity to redo questioning for the record.

/ / /

/ / /

## II.     The ALJ Did Not Comply with the Remand Order

Plaintiff argues that the ALJ failed to follow the Appeals Council's remand order because the ALJ did not update the record to include another consultative exam by a new consultative examiner. ECF No. 11 at 3. Defendant responds that Plaintiff misrepresents the Appeals Council's remand order, because the remand order simply directed the ALJ to "obtain additional evidence concerning the claimant's mental and physical impairments" and that this "may include, if warranted and available, consultative examinations . . . ." ECF No. 12 at 7-8.

On remand, an ALJ must comply with an Appeals Council order. *See* 20 C.F.R. § 404.977(b). An ALJ who "fails to take an action ordered by the Appeals Council or takes an action that is 'inconsistent with' the Appeals Council's remand order commits legal error." *David Allen S. v. Saul*, 2021 WL 907103, at *5 (E.D. Wash. Mar. 9, 2021).

Here, the remand order stated that "[t]he hearing decision finds developmental disorder as a severe mental impairment . . . . There are no corresponding mental limitations in the residual functional capacity. . . . Accordingly, further evaluation of the claimant's mental impairments and any resulting limitations is needed." AR at 157. On remand, the Appeals Council directed the ALJ to:

- Obtain additional evidence concerning the claimant's mental and physical impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512 and 416.912). The additional evidence may include, if warranted and available, consultative examinations with psychological testing and medical source opinions about what the claimant can still do despite the impairments.
- *Further evaluate the claimant's mental impairments* in accordance with the special technique described in 20 CFR 404.1520a and 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c) and 416.920a(c).

- *Give further consideration to the claimant's maximum residual functional capacity* and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations . . . .

AR at 157-58 (emphasis added).

The ALJ's first decision found that Rodgers had severe "developmental disorder." AR at 144 ("The claimant has the following severe impairments: epilepsy, hyperextension of the shoulders, developmental disorder, and obesity."). To support this finding, the ALJ relied on the findings of the psychological consultants, Drs. Franco and Abrahimi. *Id.* at 146 (citing AR at 74-88, 106-120); *see also id.* at 80, 112 (both Dr. Franco and Dr. Abrahimi finding "severe depression" with moderate limitation in concentrating, persisting, or maintaining pace). The ALJ stated that he gave Drs. Franco's and Abrahimi's opinion "[g]reat weight." *Id.*

On remand, the ALJ did not "obtain additional evidence concerning the claimant's mental and physical impairments," instead, the ALJ "[f]urther evaluate[d] the claimant's mental impairments".  In doing so, the ALJ changed his initial conclusion and left out any mention of a developmental disorder. *Compare* AR at 144 (finding at the first hearing that "[t]he claimant has the following severe impairments: epilepsy, hyperextension of the shoulders, developmental disorder, and obesity"); *with* AR at 18 (finding at the second hearing that "[t]he claimant has the following severe impairments: epilepsy, hyperextension of both shoulders, and obesity"). In the second decision, the ALJ gave great weight to Dr. Vandenburgh's finding that there was no limitation in any mental functional area other than the capacity to perform complex tasks. *Id.* at 19, 21. The ALJ explained that unlike Drs. Franco and Abrahimi, Dr. Vandenburgh examined the claimant and administered psychometric tests.

Although, the ALJ gave great weight to Dr. Vanderburgh as to the limitations in mental functional areas, the ALJ did not sufficiently address Dr. Vanderburgh's opinion regarding Plaintiff's significant hygiene problems, which appear to be most likely a

1  symptom of a mental disorder, namely depression. The record reveals that Plaintiff has
2  practiced poor hygiene since the eighth grade when he stopped going to school due to
3  depression. *Id.* at 631. Nearly every provider that has seen him over the course of the last
4  ten years has noted that he is "malodorous." *See e.g.*, *id.* at 81, 590. Dr. Vandenburgh
5  noted that he "was strongly malodorous [and that she] had to leave the door to the room
6  open and switch out the chairs and spray[] the room after he left." *Id.* at 670. Dr.
7  Vanderburgh opined that Plaintiff's significant hygiene problems would prevent him
8  from finding employment. *Id.* at 670, 675. Dr. Franco also reported that Plaintiff was
9  "strongly malodorous" and had poor hygiene. *Id.* at 79-80. It is not clear to the Court how
10 the ALJ gave Dr. Vandenburgh such "great weight," yet neglected to discuss the
11 seriousness of the finding and/or factor it into the vocational expert hypotheticals

12      The Appeals Council instructed the ALJ to "further evaluat[e Plaintiff's] mental
13 impairments and any resulting limitations . . . ." *Id.* at 157. The ALJ did not account for
14 this unusual hygiene condition reported by multiple sources, its limitations and its effect
15 on Plaintiff's ability to obtain employment. Instead, the ALJ concluded that Plaintiff
16 could return to his earlier position as a cashier, (*id.* at 26), with regular interaction with
17 the public. On remand, the ALJ should examine the limitations created by Plaintiff's
18 significant hygiene problem. However, the Court agrees with Defendant that the remand
19 order did not require the ALJ to conduct a new consultative examination.

20      Thus, the Court **DECLINES TO ADOPT** the Magistrate Judge's recommendation
21 on this issue and on **REMAND**, directs the ALJ to sufficiently consider Rodgers's mental
22 impairments, including his hygiene issues, and incorporate any such limitation into the
23 residual functioning capacity analysis.[2]

24 
25 
26 [2] Further, the Court notes that the ALJ makes reference a number of times in the second
27 decision to the fact that "claimant pursued minimal mental health treatment" and that this
   supports finding that his mental limitations are not "severe." AR at 21. As stated below in
28

III.     **The ALJ Did Not Sufficiently Account for Any Medication Non-Compliance Due to Financial Hardship**

Plaintiff has claimed a disability based on a number of medical conditions, including epilepsy. The ALJ concluded that Plaintiff's epilepsy was remediable with medication. *Id.* at 26. Plaintiff argues that the ALJ reached this decision by improperly relying on Plaintiff's non-compliance with his seizure medication because Plaintiff's non-compliance was caused by financial hardship. ECF No. 11 at 5. Defendant responds that the ALJ adequately acknowledged Plaintiff's financial hardship when the ALJ found that "at times, financial constraints, lack of insurance, and confusion contributed to the claimant's medication noncompliance." AR at 25-26. In his 2021 ruling, the ALJ stated that Plaintiff "testified in November 2020 to having insurance, which is also reflected in the medical record. Further, the medical records cited above establish that the claimant's seizure disorder was effectively managed with medication." *Id.* at 26.

Plaintiff is correct that an ALJ cannot deny benefits to a claimant who fails to obtain medical treatment that would ameliorate his condition if the claimant cannot afford that treatment. *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995). Under *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995), the question is whether Plaintiff's seizure condition, without treatment, satisfied the disability criteria for any period of at least 12

---

reference to Plaintiff's medication non-compliance, lack of treatment cannot be counted against a claimant when lack of treatment is due to financial hardship or mental health impairments. *See Bispo v. Comm'r of Soc. Sec.*, 2022 WL 1598563, at *11 n.7 (E.D. Cal. May 20, 2022) (finding that a scarcity of medical records should not count against a claimant who testified he missed appointments because of "anxiety and agoraphobia" and because he could no longer afford it after the provider stopped accepting his insurance). On remand, the ALJ should similarly determine if any perceived lack of mental health treatment was due to financial constraints or the mental health conditions themselves.

consecutive months since June 1, 2012. Then, the ALJ must determine if any of Plaintiff's medication non-compliance during this period was the result of financial hardship and/or uninsured status. *See also Trevizo v. Berryhill*, 871 F.3d 664, 680-81, 681 n.9 (9th Cir. 2017) (finding that the ALJ should determine if claimant can afford their medication and that the ALJ should have questioned claimant "about the nature of her insurance plan's prescription drug coverage before reaching her conclusion"). Although the Ninth Circuit has not directly addressed the question of retroactive, "closed period" benefits, other Circuits have found that even when a claimant's medical condition has "ameliorated" over the course of litigation, the claimant might still be entitled to receive disability benefits "for the period of time during which [he] was disabled." *See Saunders v. Kijakazi*, 6 F.4th 1, 5 364 (D.C. Cir. 2021) (finding the ALJ failed to evaluate the evidence "to determine whether [claimant] was entitled to at least a closed period of disability"). Even if a claimant has sufficiently recovered from any alleged disability, an ALJ must nevertheless determine whether a claimant is "at least entitled to disability benefits during [a previous] twelve-month period" during which they met the disability criteria. *Id.*

Although the ALJ should make additional findings on remand, the Court in particular notes Plaintiff's October 10, 2012 hospital visit, at which Plaintiff stated he had no job and no primary physician due to being uninsured, and that he "usually only has a script for 1 month following [discharge] from the hospital." AR at 440. The Court also notes that it appears to have taken Plaintiff and his doctors many years to find a medication regime that was effective. Plaintiff was treated with an array of medications from 2012 through 2020 with varying efficacy, availability, and side-effects. *See e.g.*, *id.* at 587, 592, 596, 700. Medication noncompliance should not count against Plaintiff if the medication was not effective and/or presented with severe, unreasonable side effects. *See e.g.*, *id.* at 587 ("Patient was on Keppra and apparently he said it cause[d] drowsiness.

24

1 Now he is taking dilantin 300 mg daily. He takes it in the am because he says if he takes

2 it at night it keeps him awake. Was previously going to take classes or work but he says

3 the [seizures] got in the way."); *see also id.* at 700 (stating he "[h]ad several GM seizures

4 as he was switching to Lamictal" and that "[w]hile on Dilantin he continued having GM

5 seizures once or twice a month").

6       Plaintiff testified in November 2020 that he had insurance, (*see* AR at 63),

7 however, this is not the end of the inquiry. On remand, the ALJ should analyze whether

8 there was a 12-month period during which the evidence supported a conclusion that

9 Plaintiff was disabled due to his uncontrolled epilepsy which was the result of financial

10 difficulty in obtaining seizure medication or the lack of an effective seizure medication.

11 Thus, the Court **DECLINES TO ADOPT** the Magistrate's recommendation on this issue

12 and **REMANDS** the case for the ALJ to determine (1) whether Plaintiff's untreated

13 seizure condition satisfied the disability criteria for at least 12 consecutive months; and

14 (2) if Plaintiff's medication non-compliance was the result of financial hardship.

15     **IV.**   **The ALJ Applied the Correct Standard in Weighing Physician Opinions**

16       Plaintiff argues the ALJ committed legal error in that he "failed to use the proper

17 framework for his weighting of the medical evidence in this case." ECF No. 11-1 at 4.

18 Plaintiff argues that because the case was filed on November 14, 2016, the pre-2017 rules

19 codified in 20 C.F.R. § 404.1527 and § 416.927 are controlling. *Id.* These regulations

20 state that the medical opinion of a treating physician should be given controlling weight

21 so long as it is "'well-supported by medically acceptable clinical and laboratory

22 diagnostic techniques and is not inconsistent with the other substantial evidence in [the

23 claimant's] case record.'" *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2018) (quoting

24 20 C.F.R. § 494.1527(c)(2)). To reject an uncontradicted opinion of a treating or

25 examining doctor, an ALJ must state clear and convincing reasons supported by

26 substantial evidence. *Id.* If a treating doctor's opinion is contradicted by another doctor's

27

28

opinion, the ALJ may reject it only by providing specific and legitimate reasons that are supported by substantial evidence. *Id.*

Plaintiff does not specify exactly which treating physician he argues was not given controlling weight. Plaintiff simply cites to the part of the record concerning Dr. Khamishon's treatment of Plaintiff. *See* ECF No. 11-1 at 5 (citing AR at 24-27). As such, the Court assumes Plaintiff argues Dr. Khamishon's opinion was not given controlling weight. However, Dr. Khamishon's opinion appears to support the ALJ's decision. Both EEGs performed by Dr. Khamishon in 2016 and 2017 were normal. AR at 727, 728. Dr. Khamishon's November 2017 report stated that although Plaintiff had auras, the Depakote medication was working well and there were no side effects. *Id.* at 723. The most recent report from Dr. Khamishon in May 2018 states that Plaintiff has had no seizures and had a recent trip to Japan without incident. *Id.* at 726.

The ALJ relied on the state agency medical consultants to find that Plaintiff could life/carry 50 pounds occasionally and 25 pounds frequently; walk/sit/stand for six hours; etc. *See id.* at 25. This conclusion is not in conflict with any opinion provided by a treating physician, including Dr. Khamishon. Dr. Khamishon did not purport to opine on these facts. Accordingly, the Court finds the ALJ did not discount the opinion of a treating physician. The Court **ADOPTS** the Magistrate's recommendation and **DENIES** Plaintiff's Motion on this issue.

## V. The ALJ Adequately Performed Pain Analysis

Plaintiff next argues the ALJ did not contain any analysis of Plaintiff's pain, "let alone clear and convincing requirements to dispute them as required by clear circuit law." ECF No. 11-1 at 6. The Ninth Circuit requires an ALJ to engage in a two-step analysis of subjective pain testimony: (1) an ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the alleged pain; and (2) if the first prong is met, the ALJ can reject

26

the claimant's testimony about the severity of the symptoms only by offering specific, clear and convincing reasons for doing so. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).

The Court finds the ALJ engaged in this analysis. First, the ALJ noted that the "medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR at 24. Second, the ALJ notes that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." *Id.* The ALJ sufficiently reviews the medical record on this point. The ALJ notes that the medical records include no "significant, persistent objective findings to support the claimant's alleged limitations on lifting carrying, sitting, standing, and walking." *Id.* Thus, the Court **ADOPTS** the Magistrate's recommendation and **DENIES** Plaintiff's Motion on this issue.

## VI.    Substantial Evidence

Plaintiff argues the ALJ's decision is not supported by substantial evidence. To determine if substantial evidence exists to support an ALJ's decision, the Court must examine the "administrative record as a whole, considering adverse as well as supporting evidence." *Medina v. Berryhill*, 2017 WL 401936, at *1 (C.D. Cal. Jan. 30, 2017) (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)). An ALJ cannot selectively rely on only certain portions of the record to support his conclusion and ignore all other relevant and material evidence that supports a contrary conclusion. *Cathey v. Saul*, 2021 WL 4129491 (S.D. Cal. Sept. 10, 2021) (citing *Holohan v. Massanari*, 246 F.3d 1195, 1207-08 (9th Cir. 2001)).

Because the Court finds that the record is incomplete and is missing a critical part of the 2020 hearing testimony—the Plaintiff's attorney's own questioning—the Court cannot properly determine if substantial evidence exists to support the ALJ's decision.

The Court is not able to determine if this standard is met, and thus the Court **REMANDS** the case to the ALJ for the reasons stated above.

### VII.   Remand is Appropriate

The Court has discretion and may remand the case "either for additional evidence and findings or to award benefits." *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In general, when the Court reverses an ALJ's decision "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).

Here, the Court finds the proper course is to remand to the agency for additional investigation and explanation. Specifically, the ALJ should more faithfully follow the Appeals Council's remand order and further develop and consider Plaintiff's mental limitations identified in the first decision. In addition, the ALJ is directed to inquire into Plaintiff's financial hardship and what impact, if any, it had on Plaintiff's medication non-compliance. Last, the ALJ is directed to provide Plaintiff's attorney an additional opportunity to question him on the record.

## CONCLUSION

For the reasons above, the Court **ADOPTS IN PART** the Magistrate's Report, **GRANTS IN PART** Plaintiff's Motion for Summary Judgment, and **REMANDS** the case to the Commissioner of Social Security for further administrative proceedings.

**IT IS SO ORDERED.**

Dated:  March 30, 2023

Hon. Gonzalo P. Curiel
United States District Judge